**FRANKLIN PAVKOV CONSTRUCTION COMPANY,** Plaintiff,

v.

**ULTRA ROOF, INC.,** Defendant,

and

**International Fidelity Insurance Company, Additional Defendant on the Counterclaim.**

No. 96–CV–1297.

United States District Court, N.D. New York.

June 1, 1999.

Hinman, Straub, Pigors & Manning, P.C., Albany, New York, Thomas D. Latin, Arthur P. Scheuermann, of Counsel, for plaintiff.

Bouk, Holloway, Kiernan & Casey, Albany, New York, David B. Cabaniss, of Counsel, for defendant Ultra Roof.

Helm, Shapiro, Anito & McCale, P.C., Albany, New York, Mark D. Lansing, of counsel, for defendant International Fidelity.

### MEMORANDUM–DECISION AND ORDER

HURD, United States Magistrate Judge.

## I. INTRODUCTION

Plaintiff, Franklin Pavkov Construction Company ("Pavkov" or "plaintiff") alleges that defendant Ultra Roof, Inc. ("Ultra Roof") breached a subcontract entered into between the two companies. Pavkov claims that Ultra Roof, which subcontracted with Pavkov to retrofit a roof at an Army facility in Rotterdam, New York ("Rotterdam project"),[1] did not timely commence work on the project, unreasonably delayed performance, and abandoned the project without justification. Ultra Roof contends that its duty to perform was discharged due to Pavkov's failure to make payments according to the terms of the subcontract and counterclaimed for breach of the subcontract. Defendant International Fidelity Insurance Company ("IFIC") is Pavkov's bonding company,[2] and was made an additional defendant on Ultra Roof's counterclaim.[3]

## II. TRIAL

A five day bench trial was conducted from February 3, 1999 through February 9, 1999 in Utica, New York. Testifying on behalf of the plaintiff was its Vice President, Mark Pavkov. Also testifying in support of plaintiff were Vince Pavkov, project manager for the Rotterdam project, and John Miller, the Federal government inspector for the project. Finally, plaintiff called Martin Keller, owner of Kelco Roofing & Sheet Metal, Inc., Peter Corsi, and Ed Kolbako, president of Ed's Electrical Service, Inc., to testify concerning the issues of costs of completion and work remaining on the project after Ultra Roof left the site. Testifying on behalf of the defendant were Alan Beck ("Beck"), owner of Ultra Roof, and Jackie Lane, project superintendent. Post trial proposed Findings of Fact and Conclusions of Law were filed by all parties on April 15, 1999.

Based upon all of the evidence, including voluminous exhibits, and the credibility of

1. Retrofitting entails building over, rather than replacing, the existing roof.

2. All federal construction contracts require the contractor to obtain performance and payment bonds. *See* 40 U.S.C. § 270a (1986) (hereinafter referred to as the "Miller Act").

3. Ultra Roof's claim against IFIC is really in the form of a cross-claim.

the witnesses, the following constitutes the Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52.

## III. FINDINGS OF FACT

### A. *The Subcontract*

Pavkov is a corporation organized and existing under the laws of the State of Ohio, which engages in roof contracting. In September of 1993, Pavkov entered into a contract with the United States Government, Department of the Army, for the construction of a retrofit roof at the Army Facility in Rotterdam, New York. The contract was for the sum of $723,549.00. The contract, designated as contract number DAKF36–93–C–0094, called for performance to begin within ten (10) days and completion within three hundred sixty (360) days after receiving the notice to proceed. The contract provided that failure to complete the work within the time specified in the contract, or any extension, would result in the contractor having to pay liquidated damages in the sum of $177.91 per day for each day past the completion date. The contract also provided that, in the event that the contractor withheld any monies from a subcontractor, the contractor must provide written notice to the subcontractor, identifying the amount being withheld, the reason for the withholding, and the mandatory remedial action. In addition, a copy of such written notice must be given to the contracting officer. Specifications for the Rotterdam project and the applicable rates of wage were attached to the contract. Pavkov was to bill the Government monthly and be reimbursed monthly based upon the percentage of work completed, which Pavkov and the government inspector were to agree upon. Pursuant to the contract and the terms of the Miller Act, Pavkov obtained a performance bond and payment bond from IFIC. The payment bond was in the penal sum of $361,774.50.

Although Pavkov originally intended to perform the contract itself, it later decided to subcontract the work. In or about December of 1993, Mark Pavkov directed his brother, Vince Pavkov, to solicit bids. Vince Pavkov contacted Alan Beck, owner of Ultra Roof, who had previously quoted a price to complete the project. On December 14, 1993, Beck faxed a one-page letter to Vince Pavkov's attention proposing to complete the Rotterdam project for the sum of $575,543.00. The letter, which was received the same day by Pavkov, contained four Roman numeral headings outlining the terms of the proposal. The fourth section, labeled "Terms and Conditions", contained five subsections, which read as follows:

A) Ultra Roof Inc. will be paid 3% for Mobilization of the total amount of our Contract, due upon receipt of invoice.

B) Ultra Roof Inc. will furnish Certified Payroll Reports Weekly (sic) & will be paid weekely (sic) on the following Friday.

C) All material supplied by Ultra Roof Inc. to be paid Net 30 days, Ultra Roof Inc. takes exception to our payment being contingent upon the General Contractor receipt of Payment from owner.

D) Ultra Roof Inc. will not agree to liquidated damages until (sic) a mutually agreed upon schedule [is] reached.

E) Ultra Roof Inc. will perform roofing in a neat & workmanship type manor (sic), we are not responsible for subsequent cleaning.

(Ex. D–2.) Subdivision "E" was not followed by any further language other than Beck's closing and signature line.

Vince Pavkov reviewed the proposal and discussed it with Mark Pavkov, at which time certain changes were made. Vince Pavkov handwrote "Addendum A" at the top of the proposal. In addition, since Mark Pavkov found the payment term in subdivision "B" unacceptable, an additional payment term was added at the bottom of the proposal, which read as follows:

F) First Payroll Payment will be made two weeks after commencing work and subsequent payments in line with %

completion and # B under terms and conditions.

(Ex. P–41.) There is no evidence that this change was ever faxed to Beck. Additionally, Vince Pavkov's testimony at his deposition and at trial are contradictory regarding whether he had ever discussed the changes made to the proposal with Beck. (Tr. at 130, Vince Pavkov Dep. at 34, 41.)

Vince Pavkov faxed a one-page letter to Beck on December 14, 1993 requesting a meeting with Beck on December 16, 1993 at Ultra Roof's office in Jasper, Indiana to discuss the Rotterdam project, sign the subcontract, discuss the start date, submittals, and payment schedule, and some other matters. No mention was made in this letter of any changes made to Beck's December 14, 1993 proposal.

Prior to traveling to meet with Beck, Vince Pavkov prepared several documents which would comprise the subcontract. The first page was a preprinted subcontract agreement indicating that the subcontract applied to the Rotterdam project, the price, and a start date of April 15, 1994 and completion date of August 31, 1994. In addition, the first page referenced terms contained in "Addendum A". The second page was a version of Beck's proposal typed up at Pavkov's offices titled "Addendum A" and containing the changes made by Pavkov except subdivision "F". The third page contained subdivision "F" and signature lines for Beck and Vince Pavkov. The fourth page consisted of a statement and acknowledgment. This page acknowledges that certain clauses contained in the government contract with Pavkov, which include the Contract Work Hours and Safety Standards Act ("CWHSSA"), 40 U.S.C. §§ 327–333 (1986), and the Davis–Bacon Act, 40 U.S.C. § 276a–276a–5 (1986), also apply to the subcontractor. None of the pages were numbered.

Vince Pavkov and Beck met on December 16, 1993 at which time, Vince Pavkov presented two copies of the subcontract documents. The copy which Vince Pavkov brought back with him to Ohio contained Beck's signature on the first page (the preprinted form) and the last page (the statement and acknowledgment). Neither Beck's signature nor his initials appear on either page of "Addendum A". Vince Pavkov's signature does not appear on any page of the subcontract which he retained. The copy of the subcontract which Beck retained contained the signatures of both Vince Pavkov and Beck on the preprinted page and the statement and acknowledgment. Beck's copy only contains page one of "Addendum A". It does not contain the second page of the addendum, which bore subdivision "F".

Beck testified that he was never shown page two of "Addendum A", he never discussed it with anyone from Pavkov, and he would not have agreed to subdivision "F". (Tr. at 882.) Mark Pavkov testified that he intended to have Beck sign "Addendum A". (Id. at 625–26.) Mark Pavkov also claimed that he would never enter into a subcontract where payment was made on any basis other than percentage completion. However, on January 20, 1994, only one month after the subcontract for the Rotterdam project was signed, Pavkov entered into a subcontract agreement with Ultra Roof for a roofing project at Fort Gordon, Georgia. The agreement contains an "Addendum A" with the same payroll term as Ultra Roof's proposal for the Rotterdam project contained. The Fort Gordon subcontract did not contain any terms similar to subdivision "F" and both Beck and Vince Pavkov signed the addendum page on that subcontract.

There is simply no evidence that Beck ever saw, discussed, or agreed to be bound by subdivision "F". Therefore, subdivision "F" is not a part of the subcontract agreement between Pavkov and Ultra Roof for the Rotterdam project.

### B. *Problems in Performance*

Pursuant to the subcontract, Ultra Roof was to perform the entire project which

constituted Pavkov's contract with the government. This included preparation and submission of drawings to the government for approval. On or about December 17, 1993, Beck sent plans and specifications to Atlantic Framing Design, Inc. ("Atlantic Framing") for design of the roof system to be used at the Rotterdam site. On January 7, 1994, the drawings from Atlantic Framing were sent to Pavkov along with other materials to be submitted to the government for review and approval. Over one month later, on February 8, 1994, Pavkov forwarded these materials to the government. Ultra Roof could not commence work on the project because it could not order materials and finalize the drawings until it received the government's response. On February 28, 1994, the government notified Pavkov that the drawings were approved in part and rejected in part. Pavkov did not notify Ultra Roof of this until March 21, 1994. On May 25, 1994, Ultra Roof sent Pavkov a second set of drawings and submittals which were forwarded to the government the next day. On May 26, 1994, Atlantic Framing advised Ultra Roof and Pavkov that the drawings were complete except for two areas that required clarification by the government. A meeting was held at the Rotterdam site in early June. Alan Beck, Vince Pavkov, the government engineer, and an engineer from Atlantic Framing were present.

The government sent Pavkov a Notice to Cure on June 10, 1994 as a result of its rejection of the second set of drawings. The drawings were finally approved in late June 1994. In the meantime, Ultra Roof received a proposal from Schenectady Steel Company, Inc. ("SSCI") on June 17, 1994 to furnish and erect structural steel

material for the sum of $81,950.00. Subsequently, this amount was increased by $625.95, bringing the total of the estimate up to $82,575.95. Ultra Roof billed Pavkov $51,520.00 on June 24, 1994, for material stored offsite at SSCI. However, Ultra Roof had not yet been billed by SSCI.[4]

SSCI mobilized to the job site on June 30, 1994. SSCI requested a joint check agreement between it, Ultra Roof, and Pavkov as a condition of performance. On July 7, 1994, Vince Pavkov sent a letter to SSCI agreeing to issue joint checks payable to Ultra Roof and SSCI and promising that payment would be made no later than forty (40) days from the date of delivery.

On July 1, 1994, differing site conditions were found. Ultra Roof notified Pavkov that day, recommended a resolution, and suggested that Pavkov notify the government requesting advice as to how to proceed. Pavkov repeatedly sent letters to the government with no response. During the months of July and August, only six percent (6%) of the work was completed on the Rotterdam project. Ultra Roof had not mobilized to the site yet, but it billed Pavkov a three percent (3%) mobilization fee, which totaled $17,266.29. The contracting officer finally responded to Pavkov's request for advice on August 2, 1994. With Ultra Roof's completion deadline approaching fast, Pavkov requested an extension, citing the government's delays in responding to Pavkov's request for advice with respect to the differing site conditions. The government acknowledged that the differing site conditions required a contract modification, however, it was unwilling to extend the completion date. In September of 1994, Pavkov again request-

---

4. Ultra Roof was not invoiced for these materials until July 25, 1994, when it was billed $17,800.00, and October 21, 1994, when it was billed $12,900.00. Is should be noted that, although SSCI billed Ultra Roof a total of $30,700.00 as of October of 1994, Ultra Roof billed Pavkov $51,520.00, which means that Ultra Roof added approximately 67% as a markup.

Pavkov paid Ultra Roof's invoice in two payments, one on July 20, 1994 in the amount of $25,000.00, and one on November 28, 1994 in the amount of $26,520.00. However, on July 15, 1994, John Miller, the government inspector noted in his report that the materials invoiced were not stored offsite at SSCI and the government did not reimburse Pavkov.

ed a contract extension as well as a winter shutdown. Only six percent (6%) of the work remained complete at this time. On December 12, 1994, the government granted Pavkov a winter shutdown and extended the contract completion date to July 31, 1995. Pavkov claims that the delays incurred during 1994 were Ultra Roof's fault. However, Vince Pavkov attributed the delays in 1994 to the government's lack of response concerning the differing site conditions. (Ex. P–67.) Additionally, ascertaining the responsible party is of no consequence because the government granted Pavkov the extension it requested.

By November 1994, Pavkov had made five payment applications to the government. Attached to the payment applications, Pavkov included a contract progress report and a contractor's affidavit. The affidavit states that subcontractors had been paid from previous payments received and that timely payment would be made from the current application's proceeds. Pavkov also indicated that no amounts were being withheld from subcontractors. Pavkov had so far received a total of $441,364.89 from the government and had paid Ultra Roof $296,373.74. In addition, many of Pavkov's payments were well over two weeks late. Furthermore, Pavkov did not pay in accordance with either subdivision "B" or subdivision "F" (assuming, arguendo, that subdivision "F" was part of the subcontract).

During an inspection in December 1994, government inspector John Miller had determined that, miraculously, sixty-one percent (61%) of the project was complete even though no workers had been on the site since November, when the estimate was that six percent (6%) was complete.[5] Roof leaks were noted due to improper sealing, however, these leaks are not at-

tributable to Ultra Roof since it had not done any work at the site at this point.

Ultra Roof was to remobilize to the site on April 1, 1995. It did not remobilize, however, until mid-May of 1995. Beck claims that, prior to remobilization, he discussed his concern over late payment of invoices in 1994 and Pavkov's ability to cash flow the Rotterdam project with Vince Pavkov. A January 12, 1995 letter from Beck to Vince Pavkov expresses Beck's concerns. (Ex. D–91.) In addition, Beck justified not mobilizing to the Rotterdam site based upon Pavkov's poor payment history on the Fort Gordon project. Beck testified that he told Vince Pavkov that he would not mobilize to the site until all invoices which were overdue on the Rotterdam project were made current. (Tr. at 919.)

Upon mobilization, Ultra Roof began to invoice Pavkov for weekly labor. Attached to its invoice, Ultra Roof submitted a certified payroll report. It did not attach proof of shop time or manufacturing time, therefore, the amount of the invoice did not correspond to the total amount for labor contained on the certified payroll report. In addition, Ultra Roof was billing Pavkov for travel time of its employees to the job site, which should have been part of its mobilization fee already billed. In fact, Ultra Roof billed Pavkov a second mobilization fee in June of 1995. Also, Ultra Roof billed Pavkov for holidays when its employees did not actually work. Furthermore, Ultra Roof marked up all of its invoices at various rates, ranging from twenty percent (20%) to two hundred percent (200%) on the last payroll invoice,[6] so that Pavkov was paying Ultra Roof's general liability insurance, worker's compensation and payroll taxes. Pavkov did not take issue with the discrepancy and paid the invoices from Ultra Roof. However,

---

**5.** Although the percentage completion is based upon materials at the site as well as labor actually performed, this still does not explain the vast increase in the estimated percentage complete.

**6.** In attempting to account for the 200% markup, Beck testified that he believed his wife, who handled the payroll, "knew that this was the last [invoice] and she was gonna make it a good one." (Tr. at 974.)

Pavkov did continue the same pattern of untimely payments on Ultra Roof's invoices.

On June 14, 1995, Beck wrote Vince Pavkov threatening to pull his crew from the project because Pavkov was substantially behind in its payments. This included an invoice from SSCI to Ultra Roof for the balance remaining on their contract, $41,340.00. Ultra Roof added a fifteen percent (15%) mark up to this amount and sent an invoice to Pavkov, noting that the invoice was for setting structural steel. However, Ultra Roof never sent the actual SSCI invoice to Pavkov, nor did Ultra Roof indicate on its own invoices what amount, if any, was to be paid to SSCI. Consequently, Pavkov never issued joint checks payable to Ultra Roof and SSCI pursuant to the July 7, 1994 agreement.

After the July 31, 1995 completion date passed, Ultra Roof continued to work on the project. Pavkov did not terminate its contract with Ultra Roof. Pavkov, relying on Beck's estimation, notified the government that the project could be completed by September 30, 1995. The government allowed work to continue and did not issue any more notices to cure or default notices to Pavkov. On September 5, 1995, the government notified Pavkov that it was going to begin withholding liquidated damages from its payments until the project was complete. The project, now over one month passed the completion date, was only eighty-five percent (85%) complete. Also on September 5, 1995, SSCI had completed its obligations under its agreement with Ultra Roof, but had only been paid $30,700.00 of the $82,575.95 it invoiced. Thus, SSCI was still owed $51,875.95.

A Department of Labor ("DOL") investigation ensued in September, 1995 to ascertain whether or not Beck was paying his employees pursuant to the proper wage rate classifications. The DOL interviewed Ultra Roof employees at the job site and requested payroll reports from Beck. On September 15, 1995, the Department of Labor informed Beck that Ultra Roof had violated the Davis–Bacon Act since May 1995 by improperly classifying its workers on the Rotterdam project as laborers and roofers. These workers should have been classified as iron workers and sheet metal workers, both of which require payment at a higher rate of wage. As a result of its misclassification, the DOL calculated that Ultra Roof employees were due a total of $33,332.16 in back wages. The DOL also found that Ultra Roof did not properly pay overtime to employees who performed on-site fabrication, in violation of the Contract Work Hours and Safety Standards Act. Therefore, Ultra Roof was assessed another $2,351.40. Thus, the total amount due to the DOL was $35,683.56. After Beck claimed he was unable to pay the amounts due, Pavkov paid the total amount due to the DOL by authorizing the Army to transfer $35,683.56 to the United States General Accounting Office ("GAO"). The GAO then paid Ultra Roof's employees the back wages.

In September of 1995, Pavkov was contemplating hiring another contractor, but Ultra Roof continued to work on the project until October 1995. From July through October of 1995, Ultra Roof's progress was very slow. Leaks in the roof hampered what little progress was made. However, Vince Pavkov advised the government contracting officer that the "workmanship was fine". (Ex. P–147.) Meanwhile, Pavkov made no payments to Ultra Roof after July 31, 1995, except one payment on September 28, 1995 for $38,-630.86, which represented a progress payment from the government to Pavkov less $1,000.00 withheld by Pavkov as liquidated damages. This amount did not correspond to any particular outstanding invoices and Pavkov did not note on the check which invoice the check was to be applied toward. This was contrary to Pavkov's custom of noting in the memorandum section of the check the Ultra Roof invoices to which the check applied. When Pavkov issued this check, close to $100,000.00 was still owed

to Ultra Roof.[7] Pavkov had never noted in its applications for payment to the government that any amounts were being withheld from any subcontractors. Beck had placed additional workers on the site during the last two weeks of June, but could not cash flow the payroll because of Pavkov's nonpayment of overdue invoices.

Finally, on October 10, 1995 Beck sent a letter to Vince Pavkov notifying him that Ultra Roof was going to stop working unless certain conditions were satisfied.[8] Beck stated for the first time that Pavkov was not paying Ultra Roof's invoices according to the terms of their subcontract. He also attributed fault to Pavkov for the DOL assessment as well as Internal Revenue Service ("IRS") penalties of $9,500.00 incurred by Ultra Roof as a result of its failure to pay its payroll taxes. However, Beck conceded that the entire amount of the IRS penalty is not attributable to Pavkov; some of it relates to other projects. Pavkov would not meet Beck's conditions. Pavkov subsequently learned from Miller that Ultra Roof left the job site. At the time Ultra Roof left, it had been paid a total of $404,358.59. Pavkov had received $614,008.74 from the government.

Pavkov mobilized to the job site on October 23, 1995. The project was allegedly 85.5% complete. However, when Pavkov took over, it received an estimate from Peter Corsi which illustrated the significant amount of work yet to be done on the project. It turned out that inspector Miller had never actually gone up on the roof until September of 1995, and arrived at his estimates of percentage complete through visual observation from the ground and

statements made to him by Jackie Lane, the Ultra Roof project superintendent.[9] While the trusses and some of the roof panels were installed, abundant structural work was incomplete which could not be observed from the ground. There were many materials yet to be installed, including: vertical bracing, horizontal bracing, flat bracing, sag rods, fire walls, bridging, gables, soffits, roof panels, and seaming on all of the roof panels. Additionally, high winds damaged roof panels installed by Ultra Roof which were not seamed into place. Corsi provided an estimate of $188,450.00 to complete the project. Pavkov completed the project itself on February 13, 1996 at a cost of $182,286.55 on materials and labor. Pavkov was paid a total of $723,634.40 from the government, after $7,361.50 was withheld as liquidated damages. In addition to having liquidated damages withheld and paying the DOL assessment, the Directorate of Contracting notified Pavkov that further liquidated damages in the amount of $1,180.00 were being withheld as a result of Ultra Roof's violations of the Davis–Bacon Act and the CWHSSA. (Ex. P–185.)

On November 24, 1995, Beck submitted a sworn Proof of Claim to IFIC, demanding payment of $106,895.00 plus the IRS and DOL assessments with respect to the Rotterdam project. (Ex. D–83.) IFIC did not pay any sums to Ultra Roof pursuant to the Proof of Claim.

This action was commenced by SSCI against IFIC, Ultra Roof, and Pavkov on August 6, 1996 pursuant to the Miller Act. SSCI sought damages in the amount of $51,875.95 for materials and labor furnished for the Rotterdam project for which

---

7. This included amounts still owed to SSCI.

8. Those conditions were: That all outstanding invoices be made current, that Ultra Roof would not be held responsible for liquidated damages, and that Pavkov would reimburse Ultra Roof for penalties assessed against it by the Internal Revenue Service and the Department of Labor.

Beck testified that his crew had already left the site by the time this letter was written. (Tr. at 980.)

9. Miller testified that he became aware that certain work had not been done that he thought had been completed. However, he stated that he could not reduce the percentage complete on his progress reports in order to more accurately reflect the status of the project.

it was not paid. On or about April 22, 1997, Pavkov and IFIC settled with SSCI for $44,500.00 in exchange for release from any further liability to SSCI in connection with the Rotterdam project and assignment of SSCI's claim against Ultra Roof. The action continued with Pavkov as plaintiff, suing Ultra Roof for breach of the subcontract agreement. Pavkov seeks reimbursement for its costs to complete the Rotterdam project, the liquidated damages assessed against it by the government, the assessment it paid to the Department of Labor, and its lost profits. Ultra Roof counterclaimed against Pavkov for breach of the subcontract, and against IFIC as Pavkov's surety. Ultra Roof seeks payment of its outstanding invoices and reimbursement for the penalties which Ultra Roof was required to pay the IRS. IFIC claims it is indemnified from liability to Ultra Roof as a result of indemnification agreements executed by Pavkov. IFIC also claims that Ultra Roof's claim against it is barred by the Statute of Limitations.

## IV. CONCLUSIONS OF LAW

### A. *Controlling Law*

It is well established that federal courts sitting in diversity actions apply federal procedural law and the substantive law of the state in which the federal district court sits. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). It has also been established that federal courts sitting in diversity actions must apply the conflict of laws rules prevailing in the state in which the district court sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus, New York's choice of law rules should be applied in this case.

■ In New York,

With respect to both contracts and torts, the 'center of gravity,' or 'grouping of contracts,' theory now governs choice of law, and the applicable law is the 'law of

the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.'

*Hormel Int'l Corp. v. Arthur Andersen & Co.,* 55 A.D.2d 905, 906, 390 N.Y.S.2d 457, 458 (2d Dep't 1977) (quoting *Babcock v. Jackson,* 12 N.Y.2d 473, 481, 191 N.E.2d 279, 281, 240 N.Y.S.2d 743, 749 (1963)); *see also Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 248 N.E.2d 576, 300 N.Y.S.2d 817 (1969) (stating that, in conflict of law situations, the law of the state having the most interest in the outcome of the litigation should be applied); *accord Crisafulli v. Childs,* 33 A.D.2d 293, 307 N.Y.S.2d 701 (4th Dep't 1970).

■ In the present case, the principal places of business of Pavkov and Ultra Roof are Ohio and Indiana, respectively. The subcontract was entered into in Indiana. However, the subcontract was to be performed and completed in New York. In addition, the alleged breaches occurred in New York. Thus, New York substantive law should be applied, since New York has the greatest interest in the subject matter of the subcontract between Pavkov and Ultra Roof and the issues raised in the instant litigation.

### B. *The Payment Terms Under the Subcontract*

■ It is well settled that, under New York law, formation of a binding contract requires "mutual assent to the terms and conditions thereof." *Gupta v. University of Rochester,* 57 A.D.2d 731, 731, 395 N.Y.S.2d 566, 567 (4th Dep't 1977) (citations omitted); *see also May v. Wilcox,* 182 A.D.2d 939, 582 N.Y.S.2d 294 (3d Dep't 1992) (stating that there must be a meeting of the minds on the essential terms to create a binding contract). "Whether a binding contract exists is basically a question of intent of the parties." *Litton Indus. Credit Corp. v. Plaza Super of Malta, Inc.,* 503 F.Supp. 83, 86 (N.D.N.Y.1980) (citing *C.M. Gridley & Sons, Inc. v. North-*

*eastern Consol. Co.*, 36 A.D.2d 1001, 321 N.Y.S.2d 171 (3d Dep't 1971)). Rather than looking at the parties' subjective intent, "[i]n determining whether the parties entered into a contractual agreement and what were its terms, it is necessary to look ... to the objective manifestations of the intent of the parties as gathered by their express words and deeds." *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399, 361 N.E.2d 999, 999, 393 N.Y.S.2d 350, 351 (1977) (citations omitted). To ascertain the objective intent of the parties, the totality of the parties' words and conduct, as well as the surrounding circumstances must be evaluated. *Id.* at 400, 361 N.E.2d at 1001, 393 N.Y.S.2d at 352.

█ In the instant case, neither party denies that they intended to enter into a subcontract agreement. They also do not dispute that they mutually agreed to the payment term contained in subdivision "B". The dispute lies in whether or not there was a meeting of the minds with respect to the additional payment terms contained in subdivision "F". The evidence demonstrates that there was not. There is no evidence that anyone from Pavkov ever discussed the terms contained in subdivision "F" with Beck. Beck denies any such discussions and Vince Pavkov's testimony is inconsistent, and thus unworthy of belief. Likewise, there is no evidence that subdivision "F" was faxed to Beck for his consideration and approval or that it was called to Beck's attention when he and Vince Pavkov signed the subcontract. Additionally, Beck's copy of the subcontract does not contain the page with subdivision "F". Furthermore, Pavkov's copy of the subcontract, which contains a separate page with subdivision "F" on it, is not signed or initialed by either party. Finally, none of the pages which were to comprise the subcontract were numbered, which might have put Beck on notice that

the third page of a four page contract was missing. It is clear then, that Beck did not assent to the addition of subdivision "F" and therefore, its terms are not a part of the subcontract. Therefore, Pavkov was obligated to pay Ultra Roof weekly on the Friday following submission of certified payroll reports. The evidence shows that Pavkov did not pay pursuant to subdivision "B" and therefore breached the subcontract.[10] The next question is, whether Ultra Roof was justified in abandoning the project as a result of Pavkov's breach.

█ Under New York law, a party is relieved of the duty to perform under a contract only when the other party has committed a material breach. *In re Lavigne*, 114 F.3d 379, 387 (2d Cir.1997). For a breach to be considered material, "it must go to the root of the agreement between the parties." *Frank Felix Assocs. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir.1997) (citations omitted) (internal quotations omitted). Failure to tender payment pursuant to the terms of a contract is generally considered a material breach. *See ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643, 649 (2d Cir.1991); *Elliott Assocs. v. Republic of Peru*, 12 F.Supp.2d 328, 344 (S.D.N.Y.1998). Thus, a party's failure to pay pursuant to a contract excuses the other party's obligation to further perform. *Frank Felix*, 111 F.3d at 289. Accordingly, Pavkov's failure to pay in accordance with subdivision "B" of the subcontract agreement constituted a material breach, thereby discharging Ultra Roof of its duty to further perform.

█ Pavkov asserts that Ultra Roof waived its rights to payment according to subdivision "B" by accepting late payments from Pavkov. Pavkov relies on the holding found in *Tri–Mar Contractors, Inc. v. ITCO Drywall, Inc.*, 74 A.D.2d 601,

---

**10.** It should be noted that even if subdivision "F" were a part of the subcontract, Pavkov did not make payments to Ultra Roof pursuant to percentage completion as required by subdivision "F". Therefore, regardless of which payment arrangement was controlling, Pavkov breached the subcontract by not paying according to either arrangement.

424 N.Y.S.2d 737 (2d Dep't 1980), for its assertion. In *Tri–Mar*, plaintiff was a general contractor which orally agreed to subcontract certain work to ITCO. ITCO abandoned the project prior to completion, arguing that Tri–Mar made its payments late and had made some partial payments on installments. The court held that "absent an express contract provision providing that time is of the essence, if one party acquiesces in the other's late payments throughout the period of the contract, the tardy party is entitled to unequivocal notice that timely payment will be required in the future." *Id.* at 602, 424 N.Y.S.2d at 739. The court then found that ITCO did not make an unequivocal demand for timely payment until approximately one month before it abandoned the project, at which time only a skeleton crew was on duty. Therefore, the court concluded, ITCO's work stoppage was not justified and constituted a breach of its subcontract. *Id.*

Notwithstanding the fact that the *Tri–Mar* decision is not binding in this jurisdiction, the instant case is factually distinguishable from *Tri–Mar*. As mentioned above, in *Tri–Mar*, the court noted that although ITCO claimed that it made oral complaints about late payments, no written request for timely payment was made until approximately one month prior to ITCO's abandonment of the project. In this case, Beck sent a letter on January 12, 1995 notifying Vince Pavkov of outstanding invoices and requesting notification of when payment would be made. (Ex. D–91.) Beck testified that he discussed with Vince Pavkov his concerns about Pavkov's ability make payments on invoices around February or March of 1995, prior to commencement of work after the winter shutdown. (Tr. at 919.) Beck also testified that he spoke to Vince Pavkov again in June of 1995, approximately three weeks after beginning work on the project, about Pavkov's late payment on three invoices. (*Id.* at 938–940.) These discussions were

the result of a letter from Pavkov to Beck dated June 8, 1995 in which Vince Pavkov states "Our intention is to remain current with your payroll." (Ex. P–108.) This letter is significant in two respects: 1) It confirms that Pavkov knew it was supposed to pay weekly pursuant to subdivision "B" and 2) it confirms that Pavkov knew that Beck had concerns about late payment on invoices. Beck responded to Pavkov by a letter dated June 14, 1995 in which Beck demanded payment on three outstanding invoices. (Ex. D–25.) The discussions of which Beck testified were also memorialized in a letter of October 10, 1995. (Ex. D–29.) Thus, the evidence shows that, unlike *Tri–Mar*, Beck did not acquiesce to Pavkov's late payments throughout the period of the contract. Therefore, Ultra Roof did not waive its right to payments pursuant to subdivision "B". Consequently, Pavkov materially breached the subcontract agreement by not making timely payments, thereby relieving Ultra Roof of its duty to perform.

## C. *Delays in Performance*

■ Pavkov contends that Ultra Roof breached the subcontract by delaying performance in three respects: 1) Failing to mobilize on April 15, 1994, 2) unreasonably delaying submission of shop drawings and submittals, and 3) failing to inspect the site prior to mobilization.[11] Pavkov claims that these delays are attributable solely to Ultra Roof and resulted in the project not being completed on time. In order to prevail on a claim for breach of contract by reason of delay, three elements must be established: 1) There was a substantial delay in performance, 2) the terms of the contract forbade such delay, and 3) injury as a result of the delay. *See United States ex rel. Falco Constr. Corp. v. Summit General Contracting Corp.*, 760 F.Supp. 1004, 1013 (E.D.N.Y.1991) (citing *S. Leo Harmonay, Inc. v. Binks Mfg. Co.*, 597

---

11. Pavkov claims that, had Ultra Roof inspected the site prior to April 15, 1994, the differing site conditions would have been discovered earlier.

F.Supp. 1014 (S.D.N.Y.1984), *aff'd,* 762 F.2d 990 (2d Cir.1985)).

■ Pavkov has not demonstrated that it was injured by Ultra Roof's failure to mobilize on April 15, 1994 or by the delays caused by the differing site conditions. Plaintiff received an extension from the government, whereby the contract deadline was extended to July 31, 1995. With respect to the delays in submission of the shop drawings and submittals, Pavkov is partly responsible for such delays. Pavkov did not forward the first set of drawings for over one month after receipt from Ultra Roof, and did not inform Ultra Roof of the government's response until almost one month after the government notified Pavkov.

■ Pavkov also claims that Ultra Roof breached the subcontract by failing to timely perform due to its failure to mobilize by April 1, 1995 and its failure to hire an adequate number of experienced workers. If the date of performance is fixed by the contract itself, time is generally of the essence. *John F. Trainor Co. v. G. Amsinck & Co.,* 236 N.Y. 392, 394, 140 N.E. 931, 931 (1923); *Trustco Bank New York v. Drake,* 195 A.D.2d 665, 599 N.Y.S.2d 763 (3d Dep't 1993). However, if contrary intent affirmatively appears, time is not of the essence. *Burgess Steel Prods. Corp. v. Modern Telecommunications, Inc.,* 205 A.D.2d 344, 345, 613 N.Y.S.2d 158, 159 (1st Dep't 1994); *Sparks v. Stich,* 135 A.D.2d 989, 991, 522 N.Y.S.2d 707, 709 (3d Dep't 1987). A party may be deemed to have waived the right to timely performance, even where the parties have agreed that time is of the essence, by accepting performance after expiration of the time limit. *See Richard Deeves & Son v. Manhattan Life Ins. Co.,* 195 N.Y. 324, 88 N.E. 395 (1909); *Allen v. Kowalewski,* 239 A.D.2d 879, 659 N.Y.S.2d 670 (4th Dep't); *Walter Sign Corp. v. State,* 31 A.D.2d 729, 297 N.Y.S.2d 45 (4th Dep't 1968); *Stefanelli v. Vitale,* 223 A.D.2d 361, 636 N.Y.S.2d 50 (1st Dep't 1996).

■ With respect to Ultra Roof's failure to mobilize until May 19, 1995 and its failure to complete the project by July 31, 1995 due to an inadequate crew, plaintiff has waived its right to timely completion. Pavkov allowed Ultra Roof to continue working on the project after the July 31, 1995 deadline. The government did not issue any notices to cure or default notices after the deadline passed. In fact, Pavkov never asked Ultra Roof to terminate work on the project; Ultra Roof left the site on its own in October, 1995. Furthermore, it should be noted that Ultra Roof did mobilize more workers to the Rotterdam site, but could not afford the payroll due to Pavkov's failure to timely pay Ultra Roof's invoices.

In sum, Pavkov has not shown it was injured by the delays occurring prior to mobilization and waived its right to timely completion of performance. Therefore, Ultra Roof did not breach the subcontract in that respect.

**D.** ***Ultra Roof's Violations of the Davis–Bacon Act and the CWHSSA***

Although Ultra Roof did not breach the subcontract by unreasonably delaying performance or performing defective work, it did commit a breach by violating the Davis–Bacon Act and the CWHSSA. Beck signed the statement and acknowledgment page on the copies of the subcontract retained by both Beck and Vince Pavkov. That page bound Beck to comply with the provisions of both Acts. The evidence is undisputed that Ultra Roof did not so comply. As a result of Ultra Roof's inability to pay the back wages due to its employees, Pavkov was forced to pay the total amount due. In addition, the government withheld liquidated damages from Pavkov because of Ultra Roof's violations.

■ The next question is whether or not Pavkov waived the breach. "[W]here a party to an agreement has actual knowledge of another party's breach

and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach." *National Westminster Bank, U.S.A. v. Ross,* 130 B.R. 656, 675 (S.D.N.Y.1991), *aff'd sub nom. Yaeger v. National Westminster,* 962 F.2d 1 (2d Cir. 1992) (citations omitted); *see also New York Tel. Co. v. Jamestown Tel. Corp.,* 282 N.Y. 365, 372, 26 N.E.2d 295, 297 (1940) (stating that "[a]cceptance of benefit under the contract with knowledge of the wrong constitutes a waiver of the wrong"). However, waiver of the right to treat the breach of contract as a recission or termination of the contract must be distinguished from a waiver of the right to recover the damages sustained as a result of the breach. *See Frankfurt–Barnett Co. v. William Prym Co.,* 237 F. 21, 28 (2d Cir.1916). Acceptance of the benefits of performance after breach is not "a waiver of a right of action for damages...." *Id.*

In the present case, it is questionable whether or not Pavkov continued to accept the benefits of Ultra Roof's performance after it had actual knowledge of the breach. The earliest evidence that Pavkov knew that Ultra Roof violated the Davis–Bacon and CWHSS Acts is a notation on an invoice from Ultra Roof dated October 13, 1995, which attempted to charge Pavkov for an "Adjustment on Labor." (Ex. P–158.) The notations reads: "Reference contract clause regarding compliance with Davis Bacon Act. Can't pay for noncompliance with contract requirements." (*Id.*) Beck testified that by October 13, 1995 the Ultra Roof crew had left the Rotterdam site. Assuming, then, that Pavkov did not find out about the breach until October 13, 1995 when Ultra Roof had already abandoned the site, Pavkov did not continue to receive any benefits of Ultra Roof's performance. Accordingly, Pavkov did not waive Ultra Roof's breach

and can recover the damages occasioned by the breach. Even assuming, arguendo, that Pavkov knew of the breach prior to Ultra Roof's abandonment and consequently waived the breach, it did not waive its rights to recover the damages incurred as a result of the breach. *See Frankfurt–Barnett Co.,* 237 F. at 28. Therefore, in either case, Pavkov is entitled to be reimbursed the amounts paid as a result of Ultra Roof's breach of the Davis–Bacon Act and the CWHSSA.

### E. *Damages*

#### 1. Pavkov

##### a. *Costs of completion and lost profits*

Since Pavkov breached the subcontract by not paying Ultra Roof in a timely manner, Ultra Roof was justified in abandoning the project. Therefore, Pavkov was bound to complete the Rotterdam project under its contract with the government. Accordingly, Pavkov is not entitled to recover any damages for its costs of completion, lost profits, or overhead costs.

##### b. *Department of Labor assessment*

As discussed above, Ultra Roof breached the subcontract by failing to pay its employees pursuant to the Davis–Bacon Act and the CWHSSA. After Beck claimed an inability to pay the resulting assessment, the Department of Labor charged Pavkov for Ultra Roof's violations. (Ex. P–186, P–175.) Pavkov paid a total of $36,863.56 as a consequence of Ultra Roof's breach.[12] Since the government assessment represents costs incurred by Pavkov as a result of Ultra Roof's breach of the subcontract, Pavkov is entitled to reimbursement from Ultra Roof with interest from the date Pavkov paid the gov-

---

12. Of the total assessed against Pavkov, $33,-332.16 represents charges for Ultra Roof's violation of the Davis–Bacon Act, $2,351.40 represents the amount charged for violation of the CWHSSA, and $1,180.00 represents liquidated damages withheld by the Department of Labor. (Ex. P–3(b), P–175, P–185.)

ernment. Accordingly, Pavkov is entitled to $46,226.96.[13]

#### c. *Liquidated damages*

 Pavkov was also assessed liquidated damages by the government as a result of the failure to complete the project on or before the revised completion date of July 31, 1995. Ultra Roof is responsible for any amounts withheld while it was still working on the project. The evidence shows that, although the government began to assess liquidated damages pursuant to the contract rate of $177.91 per day, it eventually only withheld a total of $7,361.50 from Pavkov. The project, which was supposed to be completed by July 31, 1995, was not certified complete until February 13, 1996. Therefore, the project was 197 days overdue. Of those 197 days, Ultra Roof was still on the site for 71 days (August 1, 1995 through October 10, 1995). Therefore, Ultra Roof is responsible for 36% of the liquidated damages which Pavkov paid to the government, $2,650.14, plus interest, for a total of $3,497.96.[14]

#### d. *Settlement with Schenectady Steel*

 Pavkov and IFIC negotiated a settlement agreement with SSCI on April 22, 1997. In exchange for $44,500.00, SSCI purportedly assigned its rights to any claims against Ultra Roof. Assuming, without deciding, that there was a valid assignment, Pavkov is not entitled to reimbursement from Ultra Roof for amounts paid to SSCI. Pavkov agreed to pay any bills from SSCI via joint check. Pavkov also received the ultimate benefit of SSCI's labor and materials. Therefore,

Pavkov was responsible for paying SSCI, not Ultra Roof.

### 2. Ultra Roof

#### a. *Recovery in quantum meruit*

 "[T]he proper method of computing damages for breach of a contract terminated prior to completion is Quantum meruit." *Fehlhaber Corp. v. State,* 65 A.D.2d 119, 127, 410 N.Y.S.2d 920, 926 (3d Dep't 1978) (citing *Garvin Mach. Co. v. Hutchinson,* 1 A.D. 380, 37 N.Y.S. 394 (1st Dep't 1896)); *see also William Wharton, Jr. & Co. v. Winch,* 140 N.Y. 287, 35 N.E. 589 (1893). In construction contract cases where the contract is terminated before completion, damages are calculated by considering the "actual job costs plus allowance for overhead and profit minus amounts paid." *Najjar Indus., Inc. v. City of New York,* 87 A.D.2d 329, 332, 451 N.Y.S.2d 410, 413 (1st Dep't 1982), *aff'd,* 68 N.Y.2d 943, 502 N.E.2d 997, 510 N.Y.S.2d 82 (1986) (citing *Whitmyer Bros. v. State,* 47 N.Y.2d 960, 962, 393 N.E.2d 1027, 1028, 419 N.Y.S.2d 954, 955 (1979), *aff'g,* 63 A.D.2d 103, 406 N.Y.S.2d 617 (3d Dep't 1978)); *Fehlhaber,* 65 A.D.2d 119, 410 N.Y.S.2d 920.

 Lost profits may be recovered "if (1) [the party's] alleged lost profits were caused by the breach; (2) the 'damages were fairly within the contemplation of the parties' when contracting; and (3) the damages can be proven with a reasonable certainty." *Merlite Indus., Inc. v. Valassis Inserts, Inc.,* 12 F.3d 373, 376 (2d Cir.1993) (quoting *Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 261, 493 N.E.2d 234, 235, 502 N.Y.S.2d 131, 132 (1986)). With respect to the third element, "dam-

---

**13.** On September 20, 1996, Mark Pavkov authorized the Army to transfer $35,683.56 to the United Stated General Accounting Office. (Ex. P–3(e).) With respect to the liquidated damages withheld by the government, on October 24, 1996, the government issued a change order decreasing Pavkov's contract by $1,180.00. (Ex. P–185.) Interest on the total amount was calculated from the later of the two dates.

Interest on all damages awarded in this case has been calculated at a rate of nine percent (9%) per year. *See* N.Y.C.P.L.R. 5004 (McKinney 1992).

**14.** March 14, 1996 is the date of the contract modification which assessed the liquidated damages against Pavkov. Therefore, interest was calculated from that date.

ages must be not merely speculative, possible and imaginary...." *Kenford Co. v. County of Erie*, 108 A.D.2d 132, 135, 489 N.Y.S.2d 939, 943 (4th Dep't 1985), *rev'd on other grounds*, 73 N.Y.2d 312, 537 N.E.2d 176, 540 N.Y.S.2d 1 (1989) (quoting *Najjar*, 87 A.D.2d at 334, 451 N.Y.S.2d 410). Damages may not be awarded on the basis of conjecture and guesswork. *Id.* at 135–36, 489 N.Y.S.2d 939 (citations omitted).

■■■■ As a preliminary matter, it should be stated that the fact that Ultra Roof breached the subcontract by violating the Davis–Bacon Act and the CWHSSA does not preclude its recovery under quantum meruit. First, under New York law, to recover under quantum meruit, a claimant must only establish that "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir.1994) (citations omitted). The evidence demonstrates that Ultra Roof performed labor for which Pavkov received the benefit. Ultra Roof expected compensation as evidenced by its issuance of invoices for the reasonable value of the labor performed. Therefore, Ultra Roof has satisfied its burden of establishing entitlement to recovery under quantum meruit. Second, equity demands that Ultra Roof be permitted to recover the reasonable value of its unpaid labor. If Pavkov does not reimburse Ultra Roof for its unpaid labor invoices, Pavkov would be unjustly enriched at Ultra Roof's expense. Such unjust enrichment will not be condoned under the circumstances of this case. Thus, the only question that remains is the amount to which Ultra Roof is entitled.

■■■■ Ultra Roof seeks to recover $85,762.62 in unpaid invoices plus $37,921.79 in lost profits, thereby claiming a total of $123,684.41 in damages. However, the evidence shows that Ultra Roof's recovery must be significantly reduced. Two of the invoices for which Ultra Roof seeks payment, totaling $59,928.50, concern money due to SSCI. Ultra Roof is not entitled to be paid for these invoices. As discussed above, Pavkov is responsible for paying SSCI, and Ultra Roof cannot recover for invoices from SSCI which it did not pay. Secondly, Ultra Roof charged Pavkov for holiday time for two of its employees on invoice # 1138. (Ex. D–111.) Thus, Ultra Roof wanted Pavkov to pay for two employees to *not* work on Labor Day of 1995. Pavkov is not responsible for such charges, and therefore, Ultra Roof's damages should be reduced by another $220.00.[15] In sum, Ultra Roof is entitled to recover $35,162.48, which represents the $25,614.12 in unpaid labor invoices plus interest from October 6, 1995, the date when the last payroll invoice which Ultra Roof can recover became due.

■■■■ Ultra Roof has failed to sufficiently prove its claim for lost profits. In arriving at its claimed lost profits of $37,921.79, Ultra Roof subtracted its estimated costs of completing the project ($47,500.00) from the balance remaining on the subcontract ($85,421.79). However, the estimated costs of completion are purely speculative. Beck opined that a four-man crew could have completed the Rotterdam project in forty-five (45) days, approximately seven weeks. (Tr. at 992.) Beck estimated that his payroll totaled approximately $6,000.00 per week, that he would have needed to buy drywall for approximately $5,000.00, and he would have needed to rent scaffolding, which Beck "guessed" would cost $250.00 per month. (*Id.* at 993.) Beck's estimations are especially incredible in

---

15. Ultra Roof billed Pavkov $88.00 each for two employees, for a total of $176.00. Ultra Roof added a twenty-five percent (25%) mark-up of $44.00, bringing the total charged to Pavkov to $220.00:

$$
\begin{array}{ll}
2 \times \$88.00 = & \$176.00 \\
\$176.00 \times 25\% = & \underline{\$\ 44.00} \\
& \$220.00
\end{array}
$$

light of the fact that Peter Corsi estimated that it would cost over $188,000.00 in materials and labor to complete the Rotterdam project, (Ex. P–2(c)), and Pavkov spent over $182,000.00 in materials and labor alone to complete the project. In addition, it took Pavkov almost four months to complete the project with a crew of at least seven men. Consequently, Ultra Roof cannot recover its alleged lost profits because it has failed to establish the amount, if any, to any degree of reasonable certainty.

### F. *IFIC's Claims and Liability*

#### 1. Pavkov is solely responsible for the amounts due to Ultra Roof

█ On December 16, 1988 and February 18, 1994, Pavkov executed indemnity agreements, whereby Pavkov agreed to indemnify IFIC

[F]rom and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which [IFIC] may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Contractors or Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement.

(Exhibit P–32, P–33.) Consequently, IFIC is entitled to indemnification from Pavkov in the event that IFIC pays any of Ultra Roof's damages under the performance and payment bonds.

#### 2. IFIC's cross-claim against Ultra Roof

IFIC asserted a cross-claim against Ultra Roof for indemnification or set-off for any amounts IFIC paid Ultra Roof's subcontractors or laborers. However, there is

no evidence of any payments made by IFIC to subcontractors, materialmen, or laborers of Ultra Roof. Therefore, IFIC's cross-claim must be dismissed.

#### 3. Ultra Roof's claim against IFIC as Pavkov's surety

IFIC contends that Ultra Roof's claim against it pursuant to the Miller Act, 40 U.S.C. § 270a–270d, are barred by the Statute of Limitations.[16] The Miller Act provides that "no ... suit shall be commenced [by a subcontractor against a surety on a federal construction project] after the expiration of one year after the day on which the last of the labor was performed or material was supplied ..." 40 U.S.C. § 270b(b). "Thus, the statute of limitations begins after the last work under the Miller Act is finished." *CEI, Inc. v. National Interior Contractor, Inc.,* No. 95–CV–0205, 1996 WL 365688, *2 (N.D.N.Y. June 24, 1996) (citing *United States ex rel. Air Stream Prods. Co. v. Essential Constr. Co.,* 363 F.Supp. 681 (S.D.N.Y.1973)). Compliance with the limitations period is a condition precedent to the right to maintain an action under the Miller Act. *See United States ex rel. Statham Instruments, Inc. v. Western Cas. & Sur. Co.,* 359 F.2d 521, 523 (6th Cir.1966) (citing *Missouri–Illinois Tractor & Equip. Co. v. D. & L. Constr. Co.,* 337 F.2d 507 (8th Cir.1964): *United States ex. rel. Use of Soda v. Montgomery,* 253 F.2d 509 (3rd Cir.1958)).

In the present case, no exact date was established regarding when Ultra Roof last performed work at the Rotterdam site. However, the time period was narrowed down to early October of 1995. Ultra Roof's final payroll invoice for the Rotterdam project shows that the last day that work was performed was on October 7, 1995. (Ex. D–115.) Beck sent a letter to Vince Pavkov dated October 10, 1995 noti-

---

**16.** Under the Miller Act, any person who has furnished labor or material for the construction, alteration, or repair of a public building

and has not been paid can sue the surety which issued the payment bond. *See* 40 U.S.C. § 270b.

fying Pavkov that "Ultra Roof Inc. will stop work on the [Rotterdam] project...." (Ex. D–29.) Beck testified that Ultra Roof had left the site by the time the October 10, 1995 letter was sent. (Tr. at 980.) Given Beck's testimony and the final payroll invoice, it is reasonable to conclude that Ultra Roof last performed work for the Rotterdam project at the very latest, on October 10, 1995. Accordingly, the Statute of Limitations commenced on that date.

SSCI commenced the instant action on August 13, 1996. However, Ultra Roof did not assert its counterclaim, which is in actuality a cross-claim, against IFIC until November 22, 1996, more than one year after the Statute of Limitations commenced. The question becomes, then, whether or not the counterclaim relates back to the time the original complaint was filed. This issue appears to be one of first impression in this jurisdiction. However, the Honorable Harold L. Murphy, District Judge for the Northern District of Georgia, in deciding the same issue, found that

> While the Court has located no case which addresses the application of the Miller Act's one-year limitation to cross-claims (sic), the law that governs cross-claims generally resolves the issue. There is no provision in Rule 13(g) of the Federal Rules of Civil Procedure that a cross-claim may relate back to the date of the filing of an original complaint. The common law rule that statutes of limitations do not run against pure defenses does not apply to setoffs (sic), counterclaims, or crossclaims (sic) that are affirmative, independent, causes of action. *See Chauffeurs, Teamsters, Etc. v. Jefferson Trucking,* 628 F.2d 1023, 1027 (7th Cir.1980), *cert. denied,* 449 U.S. 1125, 101 S.Ct. 942, 67 L.Ed.2d 111 (1981) (counterclaim).

*United States ex rel. Bros. Builders Supply Co. v. Old World Artisans, Inc.,* 702 F.Supp. 1561, 1569 (N.D.Ga.1988) (footnote omitted). In determining whether or not a cross-claim relates back to the date when the original complaint was filed, federal courts distinguish between those claims where the defendant seeks to somehow reduce the amount a plaintiff can recover, through defensive claims such as contribution or indemnification, and those where affirmative relief is sought. *See id.* (citing *Ash v. United States,* 363 F.Supp. 345, 346 (D.Neb.1973)); *Appelbaum v. Ceres Land Co.,* 546 F.Supp. 17 (D.Minn.1981), *aff'd,* 687 F.2d 261 (8th Cir.1982). "Defensive claims generally relate back, while affirmative claims must satisfy the applicable statute of limitations." *Appelbaum,* 546 F.Supp. at 20 (citations omitted); *see also Brothers Builders,* 702 F.Supp. at 1569 (stating that a defendant must comply with the applicable statute of limitations where the claim "is an affirmative independent cause of action not in the nature of a defensive claim....").

Ultra Roof's claim against IFIC seeks payment for labor and material provided by Ultra Roof as well as payment for the same materials for which SSCI sought payment. Thus, Ultra Roof's claim is not a completely affirmative, independent cause of action. It is based in part on sums due to SSCI which Ultra Roof may have had to pay, for which Ultra Roof seeks contribution and/or indemnification from IFIC. To the extent that Ultra Roof's claim seeks payment from IFIC for its own labor and materials, it is an independent cause of action and does not relate back to the date the original complaint was filed. Therefore, that claim is barred by the statute of limitations. To the extent that the claim seeks payment for the same materials that SSCI sought payment for, that claim does relate back and is therefore timely. However, since SSCI's claim in this action was settled and Ultra Roof conceded that its recovery should be reduced by the amount paid to SSCI in the settlement, Ultra Roof's counterclaim against IFIC is dismissed in its entirety. Consequently, only Pavkov is responsible for the damages awarded to Ultra Roof.

## V. CONCLUSION

Accordingly, it is ORDERED that

1) Franklin Pavkov Construction Company is awarded the sum of $49,724.92 against the defendant Ultra Roof, Inc.;

2) Ultra Roof, Inc. is awarded the sum of $35,162.48 against Franklin Pavkov Construction Company;

3) International Fidelity Insurance Company is awarded indemnification from Franklin Pavkov Construction Company for any amounts it pays to Ultra Roof pursuant to the performance and payment bonds;

4) Ultra Roof, Inc.'s counterclaim against International Fidelity Insurance Company is DISMISSED;

5) International Fidelity Insurance Company's cross-claim against Ultra Roof is DISMISSED;

6) No costs, disbursements, or attorneys fees are awarded to any of the parties. The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.