**FLORIDA SUGAR MARKETING & TERMINAL ASSN. INC., Plaintiff,**

v.

**LOCAL NO. 3, INTERNATIONAL LONG-SHOREMEN'S ASSOCIATION, AFL–CIO, (United Weighers and Sugar Samplers Union), John Leary, President of Local No. 3, and Local No. 1814, International Longshoremen's Association, AFL–CIO, and Louis Pernice, Secretary of Local No. 1814, Defendants.**

No. 85 Civ. 0955 (WK).

United States District Court, S.D. New York.

Aug. 4, 1987.

James R. Williams, Philip B. Rosen, Clifford R. Atlas, Jackson, Lewis, Schnitzler & Krupman, New York City, for Florida Sugar.

Jay P. Levy-Warren, Michael Barrett, Friedman, Levy-Warren & Moss, New York City, for Local 3 and John Leary.

Anthony T. Scotto, Bogucki & Scotto, New York City, for Local 1814.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

Plaintiff Florida Sugar Marketing and Terminal Association Inc. ("Florida Sugar") brings this action against Local No. 3, International Longshoremen's Association, AFL–CIO ("Local 3") and Local 1814, International Longshoremen's Association, AFL–CIO ("Local 1814") alleging, *inter alia*, that Local 3 engaged in illegal picketing and Local 1814 engaged in an illegal work stoppage, thereby causing damage to Florida Sugar in violation of Section 303 of the Labor Management Relations Act of 1947, 29 U.S.C. § 151 *et seq.*

The case was tried before us without a jury on May 6–12, 1987. We have received and carefully reviewed post-trial submissions from the parties. What follows constitutes our findings of fact and conclusions of law.

## FINDINGS OF FACTS

Plaintiff has presented evidence concerning two instances of picketing by Local 3, one in Baltimore, Maryland and the other in Brooklyn, New York. Local 1814 was only involved in the Brooklyn incident.

Plaintiff Florida Sugar sells raw sugar. Often it sells this sugar to commodity brokers, who in turn sell it to refiners. Florida Sugar then delivers it, on barges, to a refinery. Upon arrival, the sugar is offloaded from the barge by longshoremen employed by the refiner and placed on conveyor belts which take it inside the refinery. Along the way the raw sugar is sampled and weighed by employees of the refiner whose work is overseen by employees (or *an* employee) of a company retained by Florida Sugar as its representative (seller's representative"). We shall refer to these employees as the "weighers and samplers."[1] The weighers and samplers are the only employees of the seller's representative in the refinery.

Local 3 is a labor union representing unionized weighers and samplers. Local 1814 is a labor union representing refinery workers and longshoremen in Brooklyn.

The instant dispute arose when Florida Sugar attempted to save money by retaining a seller's representative which employed a non-union weigher and sampler. Local 3 took steps to stop this. The issue before us concerns the legality of those (largely successful) steps.

### 1. The Baltimore Incident

In July, 1984 Florida Sugar delivered a shipment of raw sugar to the Baltimore refinery of a company called AMSTAR. Florida Sugar hired a non-union weighing and sampling company, Caleb Brett, to represent its interests during the unloading of the sugar.

John Leary, President of Local 3 decided to travel to Baltimore from New York to picket the AMSTAR facility on July 18. Leary left New York with two other members of Local 3 at 2:30 a.m. on July 18 and drove to Baltimore, arriving at 5:30 or 6:00 a.m., in anticipation that the non-union weigher and sampler would arrive at approximately 7:00 a.m. Leary did not know the name of the company Florida Sugar had hired, nor did he make any efforts to ascertain the name of that company or the name of the individual who would be entering the refinery to do the work he felt belonged to his union. Leary and other members of Local 3 simply established a picket line at the main employee's entrance to the refinery. They carried two signs

---

which identified themselves as members of Local 3 and stated that they had a grievance concerning nonunion workers in the refinery. The signs did not identify Florida Sugar or Caleb Brett as the company against whom Local 3 was picketing.

A sign posted on the gate where these men were picketing said that it was only for the use of employees of or those having a business relationship with AMSTAR. Deposition of Ronald Frey ("Frey Dep.") at pp. 33–40. The rear gate of the facility, which was only accessible by driving part of the way around the refinery or by crossing through a neighboring Proctor and Gamble parking lot and then continuing along an easement alongside some railroad tracks, was the entrance which had been designated for use by the representative of Florida Sugar. A sign was posted on that gate which so stated. Indeed, the single representative of Florida Sugar arrived through that gate on the morning of July 18, 1984. Deposition of Henry Kief pp. 96–99. At some point later in the day one or two members of Local 3 picketed in front of that gate as well. Tr. pp. 792–793.

When AMSTAR's Employee Relations Manager Ronald Frey arrived at the plant some time before 7:00 a.m., he encountered the pickets outside the gate. He also noticed a small group of AMSTAR employees who had congregated outside the gate instead of going inside the refinery to work. Frey approached Leary and asked what the problem was. Leary responded that the problem was the use of nonunion labor. Frey asked Leary how that involved AMSTAR. Leary replied that AMSTAR was permitting the seller to use nonunion labor. Frey asked Leary to move the pickets around to the entrance where the seller's employees would enter the plant, but Leary refused. At some point during the day, either in this conversation or in a later one, Frey told Leary that AMSTAR had no control over whether the seller of the sugar used nonunion people and Leary responded that "whether [Frey] knew it or not, [AMSTAR] did have control over that situation." Frey Dep. at 43.

As AMSTAR employees arrived at the refinery and encountered the pickets at the main gate, most of them (200–300) refused to enter and go to work.

Later in the morning a meeting was held inside the AMSTAR facility attended by Leary, a representative of the AMSTAR refinery workers, and AMSTAR officials. The AMSTAR officials requested that Leary remove the pickets so that the refinery could function. Leary eventually did so at between 1:00 and 2:00 p.m.

Throughout the day AMSTAR and Florida Sugar communicated via telephone and telex. From the initial phone conversation between Ken Otto of AMSTAR and John Hale of Florida Sugar, which took place at around 9:00 a.m., Otto informed Hale of the problems at the Baltimore refinery and told him that Florida Sugar should hire union weighers and samplers. Hale informed Otto that under the contract between AMSTAR and Florida Sugar, Florida Sugar could hire whoever it wanted to represent its interests. In the second phone call, at around 10:00 a.m., Otto told Hale that if Florida Sugar did not hire a unionized seller's representative, AMSTAR would hold it responsible for any damages resulting from a work stoppage or the shutting down of the refinery. The third conversation involved Hale, Otto and a superior of Otto's within AMSTAR. During this conversation Hale was informed how much Florida Sugar could expect to be billed by AMSTAR due to the work stoppage if they had to shut down the refinery. Telexes between the parties sent later in the day confirm the substance of the communications between AMSTAR and Florida Sugar as testified to by Hale. *See* Plaintiff's exhibits 11–16. Eventually Florida Sugar did agree to replace its nonunion seller's representative with a representative who would hire union (Local 3) labor. The barge was then unloaded without further incident. AMSTAR did, however, withhold from Florida Sugar $32,022.83 for alleged costs incurred as a result of the work stoppage.

## 2. The Brooklyn Incident

The next shipment of raw sugar from plaintiff to an AMSTAR refinery was scheduled to arrive at AMSTAR's Brooklyn refinery in late August. Again Florida Sugar designated a nonunion seller's representative.

AMSTAR, anticipating problems similar to those it had experienced in Baltimore, took steps to prevent them.

The refinery workers employed by AMS-TAR in Brooklyn are represented by Division 3 of Local 1814. Since a strike by these refinery workers without sufficient notice to AMSTAR would cause liquid sugar to cool and harden inside the machinery, destroying much of that machinery, AMS-TAR had previously bargained with the union for a clause in the contract of the refinery workers which provided that they must give 72 hours notice if they intend to strike. The longshoremen, who are represented by a different Division of Local 1814, have no such provision in their contract. Indeed, they are known for their willingness to honor picket lines. *See* Tr. at 371, testimony of Louis Pantano.

Prior to the arrival of the barge, AMS-TAR's Employee Relations Manager, Thomas Murray, spoke to Louis Pantano, a union delegate for the refinery workers about possible picketing by Local 3. Pantano assured Murray on more than one occasion that his men would remain on the job and that the refinery operations would not cease.

Members of Local 3 also contacted Pantano. They informed him of what had happened in Baltimore and told him that Local 3 might also soon be picketing in Brooklyn. Tr. pp. 246, 370.

AMSTAR established a reserve gate system and posted signs on the various gates to the refinery. One gate was for employees of and for those having a business relationship with AMSTAR and a separate gate was for employees of and those having a business relationship with Florida Sugar or Savannah, the nonunion representative it had hired.

The picketing began in Brooklyn on the morning of August 22. Thomas Murray of AMSTAR closely monitored the situation and took quite detailed notes of what occured, which notes have been admitted in evidence. Plaintiff's Exhibits 33A and 33B. Although the members of Local 3 confined their picketing to the proper reserve gate, they did not carry signs until much later in the morning. Tr. pp. 228, 274, 340, 445.

At 10:15 a.m. the longshoremen walked out and left the refinery. The exact circumstances of this walkout must be pieced together from the testimony of different witnesses.

At 9:50 a.m. Joseph Randazzo, Vice President of Local 1814 asked Murray (of AMS-TAR) if he could bring Leary (of Local 3) onto the premises to speak to AMSTAR officials. Murray said "No."

Moments before the walkout, Eugene "Babe" Gorry, Trustee of Local 3 and the leader of the pickets on that day, was on his way to a pay telephone a short distance from the reserve gate. On his way to the telephone Gorry had to pass another gate where trucks entered the refinery. As he approached that gate he saw a man walking up toward the gate from the barge where the longshoremen were working. Gorry looked at the man and the man looked at Gorry. They did not speak to each other. The man then turned and walked back toward the barge. Gorry went to call his wife. When he returned, the longshoremen were walking out of the gate at which Gorry and the unidentified man had had their rather curious encounter. Tr. pp. 161–165.

Ivery Burnett, AMSTAR's Dock Superintendent and Raw Sugar Manager testified that he was on the barge that morning while the longshoremen were unloading the sugar. He saw Joseph Randazzo, Vice President of Local 1814 and two Local 1814 delegates (Ramos and Gregory) motion to Leo Gelin, the Local 1814 shop steward for longshoremen. The four men then had a brief conversation, immediately after which Burnett saw Gelin

... heading towards the barge as I was coming off. I saw him waving to the men to come off the barge, which they did.

Q. Was he saying anything?

A. He just told them to come off the barge. And as they were coming off, the ones that were on the barge, I'd say approximately half of them were on the barge, the rest of them was probably in their dressing room. He called them all out. They went outside the gate.

Tr. at p. 404.

It was 10:15 a.m. when the longshoremen walked out. They did not work for the rest of August 22. The pickets returned the next day, August 23, and the longshoremen did not go to work on that day.

As had occurred in connection with the Baltimore work stoppage a month earlier, AMSTAR again pressured Florida Sugar to designate a union seller's representative. Tr. pp. 505–517, Plaintiff's Exhibits 18–23. AMSTAR threatened to remove the barge from the dock if Florida Sugar did not promptly resolve the labor problem in Brooklyn and told it that future labor problems caused by Florida Sugar would result in its barges being removed from the dock, causing the contents of the barge to become a "distress cargo." Florida Sugar acceded to this pressure and on August 23 designated union companies to represent its interests in Brooklyn and in Baltimore.

Eventually AMSTAR withheld from Florida Sugar a total of $17,016.19 in demurrage costs resulting from the work stoppage in Brooklyn.

On August 23, 1984, Florida Sugar filed charges against Local 3 with the National Labor Relations Board. On September 6 the parties arrived at a settlement of those charges in which Local 3 agreed not to engage in any of the allegedly unlawful activities specified in the charges for a period of sixty days and to post signs in the Baltimore and Brooklyn refineries to that effect. Local 3 also agreed not to picket AMSTAR—even lawfully—for thirty days.

## CONCLUSIONS OF LAW

### 1. The Applicable Law

■ It is an unfair labor practice under § 8(b)(4) of the Labor Management Relations Act of 1947 ("the Act"), 29 U.S.C. § 158(b)(4),[2] for a labor union to exert pressure on an employer not involved in the relevant labor dispute ("the secondary employer") in order to obtain a favorable result in the ongoing labor dispute with another employer ("the primary employer"). *See Steelworkers v. Labor Board* (1964) 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (*"Steelworkers"*); *Electrical Workers v. Labor Board* (1961) 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (*"Electrical Workers"*). This type of proscribed activity is often called secondary boycotting.

Whoever is injured in his business or property "by reason of" unlawful activity under § 8(b)(4) may sue under § 303 of the Act, 29 U.S.C. § 187(b).

Here, Florida Sugar alleges that Local 3's actions in both Baltimore and Brooklyn amounted to unlawful secondary boycotting. Further, it alleges that the longshoremen's walkout in Brooklyn was an unlawful secondary boycott directed by the leadership of Local 1814, for which that union must also be held responsible.

---

**2.** Section 8(b)(4) of the Act provides in relevant part:

It shall be an unfair labor practice for a labor organization or its agents ... (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is:
(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor or manufacturer, or to cease doing business with any other person ..., Provided that nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

■ Local 3's liability depends on its objective. If it merely intended to inform the public or those doing business with Florida Sugar of its unsavory and unfair practices and the benefits to its workers of joining the union, the picketing would be lawful, even if it happened to put pressure on the secondary employer (AMSTAR). But if any object of the picketing was to induce employees of AMSTAR to engage in work stoppages, in order to put pressure on AMSTAR to force Florida Sugar to hire only union seller's representatives, that picketing would be unlawful under § 8(b)(4). *See Steelworkers; Electrical Workers; Carrier Air Conditioning Co. v. NLRB* (2d Cir.1976) 547 F.2d 1178.

Allegations of secondary boycotting are most difficult to unravel when they involve the actions and intentions of a labor union picketing at a work site where more than one employer hires laborers represented by more than one union, often known as common situs picketing.

While a union's objective can only be determined from the totality of the circumstances, *see NLRB v. Denver Building & Construction Trades Council* (1951) 341 U.S. 675, 685–692, 71 S.Ct. 943, 949–953, 95 L.Ed. 1284; *Carrier Air Conditioning, supra*, it is helpful in cases involving common situs picketing to consider the evidence in light of the standard set forth by the NLRB in *Sailor's Union of the Pacific, AFL and Moore Dry Dock Co.* (1950) 92 N.L.R.B. 547 (*"Moore Dry Dock"*), See *Texas Distributors v. Local Union No. 100, Etc.* (5th Cir.1979) 598 F.2d 393 (a cogent application of the *Moore Dry Dock* standards in a totality of the circumstances context).

*Moore Dry Dock* suggests that common situs picketing is lawful if:

(a) The picketing is strictly limited to times when the situs of dispute is located on the secondary employer's premises;

(b) at the time of the picketing the primary employer is engaged in its normal business at the situs;

(c) the picketing is limited to places reasonably close to the location of the situs; and

(d) the picketing discloses clearly that the dispute is with the primary employer. 92 NLRB at 549.

In *Texas Distributors, supra,* the Fifth Circuit identified certain indicia of an improper motive:

(1) the picketing union beforehand makes known to other unions its intent to picket;

(2) the picketing union knows that it is the policy of other unions to honor all pickets on the jobsite and not to cross such picket lines;

(3) an understanding between a secondary employer and the picketing union that work interruptions will cease if and when a picket is removed;

(4) threats, veiled or otherwise, by picketing union that a secondary employer was not using good business judgment in doing business with the primary employer;

(5) picketing only at jobsites where other unions are working and not at jobsites where only non-union workers are employed, and where picketing is never done at the primary employer's home office;

(6) the failure of a picketer to answer inquiries of others as to the purpose of the picketing. 598 F.2d at 399.

■ Guided by these various standards, we must conclude that Local 3's picketing both in Baltimore and Brooklyn was of the secondary variety proscribed by § 8(b)(4).

## 2. Baltimore

The task of determining Local 3's objective in Baltimore is vastly simplified by Leary's statement to Frey concerning AMSTAR's ability to control whether Florida Sugar hired non-union weighers and samplers: "whether [Frey] knew it or not, [AMSTAR] did have control over that situation." While that statement was not exactly an admission that Local 3's objective was to pressure AMSTAR into exercising such control, it is highly probative of the union's objective in picketing there. That statement, combined with other actions of Leary

and the Local 3 pickets in Baltimore clearly evince an unlawful secondary objective.

Moreover, the signs carried by the pickets failed to indicate that the object of the pickets' activities was Florida Sugar and Caleb Brett, not AMSTAR, thereby vastly increasing the likelihood that AMSTAR employees, and then AMSTAR, would be dragged into the dispute. Indeed, in light of Leary's statement to Frey, we can only infer that this was the result Leary intended to achieve. That conclusion is underscored by Leary's direct negotiations with AMSTAR—with whom his union did no business—which led to increased pressure on Florida Sugar, a cessation of the picketing and the end of the work stoppage, which conforms to the third indicia of unlawful activity noted by the Fifth Circuit in *Texas Distributors*.

The totality of the circumstances surrounding the picketing in Baltimore lead us to the conclusion that Local 3's objective was to force AMSTAR to put pressure on Florida Sugar. That objective is an unlawful one.

3. Brooklyn

As in Baltimore, the picketing in Brooklyn—from the outset—ran afoul of the fourth *Moore Dry Dock* standard by failing to disclose that the object of the picketing was Florida Sugar and Savannah, not AMSTAR. Indeed, the pickets in Brooklyn did not bother to carry signs at all until after the longshoremen had walked out.

Further, the evidence shows that Local 3's activities violated at least three of the indicia of unlawful picketing set forth in *Texas Distributors*.

Leary had contacted leaders of Local 1814 prior to August 22 in order to inform them of Local 3's plans and ascertain what Local 1814's reaction would be. (Indicia # 1)

In gauging the likely effects of his union's actions on Local 1814, Leary no doubt took into consideration the longshoremen's well-known preference to honor picket lines at their plant, as Pantano testified. (Indicia # 2)

While there is no evidence of an understanding between AMSTAR and Local 3 that the work stoppage would cease if the pickets were removed (Indicia # 3), Randazzo's request to Murray that he be permitted to bring Leary onto the premises to negotiate with AMSTAR officials (as he had in Baltimore), certainly suggests both a shared purpose with Local 1814 and a desire to arrive at the above-described understanding.

We also can not help but be swayed by Gorry's rather extraordinary tale of his wordless encounter with an unknown longshoreman moments before the walkout. Plaintiff's obvious intention in bringing this out was to suggest that the reason for Gorry's recollection of this incident was that it amounted to his communicating to the longshoremen—in words or otherwise—that it was time for them to walk out. We must agree with the plaintiff that no other plausible explanation for this odd testimony exists.

If the encounter had been as lacking in substance as Gorry maintained, it is inconceivable that he would have recalled it a year later at his deposition. When we questioned Gorry about why he recalled this thoroughly forgettable incident, Tr. at 173–175, he was unable to supply us with a plausible answer. Indeed, our certainty that some explanation must be found for his recollecting this incident, coupled with his unwillingness (or inability) to provide it, entitles us to conclude, as we do, that more information about this encounter would provide further evidence of an unlawful objective.

■ In its post-trial brief Local 3 has argued that even if we find that its objective was to instigate a strike by the refinery workers in Baltimore and by the longshoremen in Brooklyn, that objective was permissible under the "related work" doctrine, which functions as an exception to the secondary picketing proscriptions. *See Steelworkers*, 376 U.S. at 499, 84 S.Ct. at 904; *Electrical Workers*, 366 U.S. at 681, 81 S.Ct. at 1293; *Wires Service Guild, Local 222, the Newspaper Guild and the Miami Herald Publishing Company*

(1975) 218 N.L.R.B. 1234 (*"Miami Herald"*).

Local 3 places principal reliance on the *Miami Herald* case. Both that case and the instant situations involved an unusual form of common situs picketing where a union picketed against a small primary employer on the premises of a much larger secondary employer. However, a comparison of the efforts made by the respective pickets to inform employees of the secondary employer that the dispute did not involve their employer in *Miami Herald* and in the instant case, demonstrates that such reliance is misplaced.

In *Miami Herald* the picket signs clearly disclosed that the dispute was with the UPI. Indeed, during the picketing, the union added to its signs the statement, "Not intended to appeal to anyone other than UPI employees to cease work." As the N.L.R.B. concluded:

> There was no evidence that the Respondent orally or otherwise induced employees of neutral employers not to cross the picket line, but to the contrary, Respondent affirmatively sought to induce known union members working for employers with whom there was no dispute to cross the picket line, explaining the limited nature of the dispute.

*Id.* at 1234. Local 3 made no such effort, and instead took steps to encourage, or at least increase the likelihood that secondary employees would respect the picket line.

The difference between the instant case and *Miami Herald* is best summarized by the Supreme Court in *Electrical Workers,* 366 U.S. at 673–74, 81 S.Ct. at 1289–90, quoting *Labor Board v. International Rice Milling Co.* (1951) 341 U.S. 665, 672, 71 S.Ct. 961, 964, 95 L.Ed. 1277:

> But picketing which induces secondary employees to respect a picket line is not the equivalent of picketing which has an object of inducing those employees to engage in concerted conduct against their employer in order to force him to refuse to deal with the struck employer.

The pickets in *Miami Herald* affirmatively sought to avoid embroiling the secondary employer in their dispute with the primary, thereby evincing no unlawful objective. The pickets here, on the other hand, took steps which clearly demonstrated a proscribed secondary objective.

Accordingly, the defense based on the related work doctrine must fail. The evidence adduced at trial of Local 3's objective satisfies us that it was unlawful.

4. Local 1814's liability.

Having established Local 3's liability, Local 1814's liability plainly follows.

■ It is clear that the Brooklyn walkout was a concerted act by the longshoremen of Local 1814 and not merely the wayward act of a couple of renegade union members. Pantanno had been in touch with Leary about the picketing prior to August 22. Randazzo sought to have Leary brought on to the premises to negotiate directly with AMSTAR, with whom Leary had no lawful dispute. An unidentified longshoreman had a "confrontation" with Gorry moments before the walkout. And finally, Burnett testified that he observed Local 1814 Shop Steward Leo Gelin waive the longshoremen off the barge after a conversation with Randazzo and two other Local 1814 delegates. Since Local 1814 had no dispute with AMSTAR. this walkout was plainly of the secondary variety prohibited by the Act.

## DAMAGES

In September, 1984 Florida Sugar again designated a non-union company in connection with a shipment to AMSTAR's Brooklyn refinery. AMSTAR threatened to divert the barge from Brooklyn to Boston unless a union company was designated in Brooklyn. Such a diversion would have been very costly to Florida Sugar due to the additional travel distance and also due to the slower unloading capacity of the Boston refinery. Accordingly, due to these threats and the fear of losing its best customer, (Plaintiff;s post-trial brief at p. 12) Florida Sugar acceded to AMSTAR's demands once again and hired a union company.

At a meeting between representatives of AMSTAR and Florida Sugar held in New York on October 5, 1984, AMSTAR told Florida Sugar that due to the recent labor problems in Baltimore and Brooklyn, if it persisted in designating non-union seller's representatives, AMSTAR would cease doing business with it altogether. Since then Florida Sugar has only designated companies that employ Local 3 members as its representatives.

Florida Sugar claims that it is entitled to recover the funds withheld from it by AMSTAR as a result of the Baltimore and Brooklyn work stoppages: totalling $49,039.02. It also claims that it is entitled to recover the difference in cost between hiring a union seller's representative and a non-union seller's representative at every delivery of raw sugar it made to AMSTAR between July 18, 1984 and the present: totalling $275,339.

Section 303 of the Act, 29 U.S.C. § 187(b), provides a plaintiff with recovery of damages incurred "by reason of" a violation of the Act. That language "requires that there be a causal nexus between the unlawful secondary activity and the injury suffered by the plaintiff." *Feather v. UMW* (3d Cir.1983) 711 F.2d 530, 537. The Ninth Circuit has defined the "by reason of" language as requiring a finding that the offending conduct " 'materially contributed' to the injury, or was a 'substantial factor' in bringing it about, 'notwithstanding other factors contributed also.' " *Mead v. Retail Clerks International Association* (9th Cir.1975) 523 F.2d 1371, 1376 (citations omitted) quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.* (1969) 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 and *Perma Life Mufflers, Inc. v. International Parts Corp.* (1968) 392 U.S. 134, 143–144, 88 S.Ct. 1981, 1986–1987, 20 L.Ed.2d 982.

■ Defendants concede that if held liable, they would be responsible for the increased labor costs resulting from the use of union laborers in the two incidents in Baltimore and in Brooklyn. They deny, however, any responsibility for other costs related to delays in unloading the barges charged to Florida Sugar by AMSTAR, claiming, *inter alia*, that these charges were not actually incurred by AMSTAR, were passed along to Florida Sugar in bad faith and are properly resolved between Florida Sugar and AMSTAR. In support of this argument defendants contend that the barge would not have been unloaded on August 22 and 23 notwithstanding the walkout because the warehouse was full of sugar at the time and because it rained on July 23, preventing any work from being done on the barge.

These contentions are without merit. Plaintiff seeks to show that the walkouts caused AMSTAR to take actions which injured Florida Sugar. It need not prove that the walkout injured AMSTAR. Where "the injury alleged was precisely the type of loss that the claimed violations would be likely to cause," *Mead, supra,* 523 F.2d at 1378 quoting *Zenith Radio Corp, supra,* 395 U.S. at 125, 89 S.Ct. at 1577, we are entitled to infer that the requisite causation has been established. In causing work stoppages in Baltimore and Brooklyn, Local 3 and Local 1814 caused the barges not to be unloaded on certain days where they would otherwise have been unloaded. This led to AMSTAR's passing various costs on to Florida Sugar. Whether or not these actual costs were justified, it is obvious that they never would have been incurred by Florida Sugar absent the unlawful picketing.

Moreover, the secondary boycott proscriptions on their face prohibit a union from pressuring a secondary employer with the objective of forcing it to cease doing business with a primary employer. Local 3 and Local 1814 have already caused AMSTAR to threaten Florida Sugar with precisely that fate. It would seem anomalous under these circumstances to require Florida Sugar to mitigate the damages caused in the first instance by the conduct of Local 3 and Local 1814 by suing AMSTAR over the monies withheld, thereby almost certainly destroying what remains of their business relationship.

Having caused the work stoppages which led to Florida Sugar's out-of-pocket losses

in Baltimore and Brooklyn, Local 3 is liable for those damages. Local 1814 is liable only for the damages caused in Brooklyn.

Accordingly, Local 3 is liable for $32,-022.83 arising out of Baltimore incident. Local 3 and Local 1814 are jointly and severally liable for $17,016.19 arising out of the Brooklyn incident.

Plaintiff's claim regarding damages for all other instances where union laborers were hired between July 18, 1984 and the present must be rejected. Subsequent to the NLRB settlement neither Local 3 nor Local 1814 has done anything unlawful or anything which would suggest that it intended to picket at AMSTAR in the future. AMSTAR's fear of future walkouts—absent any acts by the these defendants—is too tenuously connected to the prior unlawful picketing to justify the vast recovery plaintiff seeks.

Let plaintiff submit an appropriate judgment on ten days notice.

SO ORDERED.