BETAL ENVIRONMENTAL
CORPORATION,
Plaintiff,

v.

LOCAL UNION NUMBER 78, ASBES-
TOS, LEAD & HAZARDOUS WASTE
LABORERS, affiliated with the Ma-
son Tenders District Council of Great-
er New York, Luina, AFL–CIO, and
York Hunter Construction, Inc. De-
fendants

No. 00 CIV.2018(CBM).

United States District Court,
S.D. New York.

Aug. 28, 2001.

Richard B. Ziskin, Law Offices of Robert M. Ziskin, Smithtown, NY, for Plaintiff.

Lowell Peterson, Meyer, Suozzi, English & Klein, P.C., Mineola, for Defendant Local Union 78, Asbestos, Lead & Hazardous Waste Laborers, affiliated with the Mason Tenders District Council of Greater New York, Liuna, AFL–CIO.

Steven Cramer, Bauman Katz & Grill LLP, for Defendant York Hunter Construction, Inc.

### OPINION

MOTLEY, District Judge.

Plaintiff, Betal Environmental Corporation ("Betal"), filed this labor action under section 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187, against defendant, Local Union 78, Asbestos, Lead & Hazardous Waste Laborers, affiliated with the Mason Tenders District Council of Greater New York, LIUNA, AFL–CIO ("Local 78"). Against Local 78, Betal seeks damages for activity and conduct defined as an unfair labor practice in violation of sections 8(b)(4)(B) and 8(b)(4)(D) of the LMRA, 29 U.S.C. §§ 158(b)(4)(B), 158(b)(4)(D). Against defendant York Hunter Construction, Inc. ("York"), Betal brings a breach of contract claim for terminating Betal's contract with York and failing to pay Betal $166,775.[1]

---

1. Plaintiff's fourth and fifth causes of action for permanent injunctive relief against Local 78 and punitive damages against Local 78, respectively, were dismissed pursuant to stipulation of the parties on October 17, 2000.

Plaintiff's sixth cause of action for a declaratory judgment voiding a provision in the collective bargaining agreement between Local 78 and York was dismissed due to this court's lack of subject-matter jurisdiction. *See Betal*

This court conducted a three-day bench trial from June 11, 2001 to June 13, 2001 and has received and carefully reviewed the parties' post-trial submissions.[2] For the reasons stated below, this court finds that Local 78 is not liable to Betal for damages under section 303 of the LMRA; however, York is liable to Betal for damages caused by its termination of Betal's services.

## I. FINDINGS OF FACT [3]

### A. The Parties

Betal is a subcontractor in the business of abating hazardous materials, including asbestos and asbestos-containing materials. Since early 1999, Betal has had a collective bargaining agreement with Local 339, United Service Workers of America which covers its six permanent asbestos laborers.

York is a construction company and is a member of a multi-employer contractors association called the Building Contractor's Association ("BCA"). The BCA has a collective bargaining agreement with the Mason Tenders District Council of Greater New York, LIUNA, AFL–CIO ("MTDC"). York is bound by the BCA–MTDC collective bargaining agreement.

Local 78 is a labor union which represents approximately 2800 employees in asbestos removal and abatement work. Local 78 is a member of the MTDC and is therefore bound by the BCA–MTDC collective bargaining agreement.

### B. BCA–MTDC Collective Bargaining Agreement

The BCA–MTDC collective bargaining agreement mandates that a BCA contractor can only subcontract work to a subcontractor that is a signatory to the BCA–MTDC collective bargaining agreement.

### C. The Library Project

York contracted with the New York Public Library for the Performing Acts to be the construction manager at the Library Project, a major renovation of the existing library building. York received bids from various subcontractors for all of the renovation work at the Library Project including the asbestos removal work.

In 1999, Ted Zach was York's project manager at the Library Project. Zach was responsible for, among other things, reviewing the bids of the subcontractors, recommending trade awards to the New York Public Library, reviewing change orders, and day-to-day operation and administration of the project from York's home office.

Keith Kallmeyer was employed by York from May 1998 to May 2001 as the Library Project superintendent. Kallmeyer operated directly from the Library Project field office and his responsibilities included establishing and maintaining a job schedule and the supervision of daily activities at the job site.

### D. York's Subcontracting Agreement with Betal

Betal was the low bidder for the asbestos removal work at the Library Project.

---

*Environmental Corp. v. Local Union Number 78, Asbestos, Lead & Hazardous Waste Laborers,* 123 F.Supp.2d 156 (S.D.N.Y.2000).

**2.** Although defendant York filed pre-trial submissions, York did not participate in the trial and did not file post-trial submissions. During the trial, plaintiff moved for a default judgment against York. This court denied the mo-

tion because York has filed an answer in this action. *See* Fed. R. Civ. P. 55(a).

**3.** This court's findings of fact are based upon the trial transcript and upon the parties' post-trial submissions which are keyed to the trial transcript.

Branko Rovcanin, Betal's vice-president who is in charge of operations, including overseeing job projects, job estimating, and client relations, submitted a proposal for the Library Project to York. Zach and Kallmeyer negotiated the subcontract with Betal.

Zach asked Vincent Quigley, who was employed by Betal as an estimator, if Betal was "union." Quigley responded that Betal was union. Zach did not specifically inquire as to whether Betal was a signatory to the BCA–MTDC collective bargaining agreement. Dennis Prude, York's vice-president in charge of field operations and labor relations and president of the BCA, admitted that Zach made a mistake by not inquiring further as to whether Betal was bound by the terms of the BCA–MTDC collective bargaining agreement. Prude also admitted that York violated the BCA–MTDC collective bargaining agreement when it subcontracted the asbestos work at the Library Project to Betal.

Upon review of Betal's proposal, York recommended Betal to the New York Public Library for the asbestos trade award. The New York Public Library approved this award. Among the documents that York provided to Betal for review was York's standard subcontract. Betal was provided with a Contract Closing Sheet that listed each document that York had provided for Betal's review. The Contract Closing Sheet reads in part: "The referenced documents have been reviewed and constitute your understanding and agreement to the project requirements for Hazardous Material Removal." Ex. 1. The last document listed on the Contract Closing Sheet is "Contract Form and Terms & Conditions." *See id.* Rovcanin initialed this item, as he did with each listed document, to indicate that he had reviewed, understood, and agreed to the terms and conditions of the contract.

Article XIII of York's standard subcontract is called a labor harmony provision. The labor harmony provision requires the subcontractor to submit any jurisdictional disputes to the "New York Plan," a dispute resolution mechanism administered by the Building and Construction Trades Council ("BCTC"). A subcontractor could only submit a jurisdictional dispute to the New York Plan if the union representing the workers was a part of the BCTC. The MTDC, of which Local 78 is a member, is affiliated with the BCTC; Local 339 is not. Rovcanin was not familiar with the BCTC or the New York Plan.

York sent Betal a letter of intent dated September 10, 1999 to enter into an asbestos trade contract for the Library Project. The letter stated in part that "By executing this Letter of Intent, you accept the form of Trade Contract." Ex. 4. Rovcanin executed the letter of intent on September 15, 1999 and returned it to York. Rovcanin acknowledged that Betal was bound by the documents referred to in the letter of intent for the Library Project. The letter of intent set the contract price as $166,775. Because of the low price, Rovcanin admitted that Betal could have lost money on the job.

### E. The Labor Dispute at the Library Project

Betal performed work at the Library Project job site from September 15, 1999 through September 22, 1999. In September 1999, Edison Severino, a business agent for Local 78, learned of the Library Project through a phone call and visited the site. As a business agent, Severino's job included protecting Local 78 members by enforcing the BCA–MTDC collective bargaining agreement. At the Library Project job site, Severino learned that Betal was handling the asbestos removal work. Severino knew that Betal did not

have a collective bargaining agreement with the MTDC.

At the job site, Severino informed Kallmeyer that Betal was not a signatory company with the MTDC and that it was a violation of the BCA–MTDC collective bargaining agreement for York to hire a non-MTDC subcontractor to perform MTDC work. Severino informed Kallmeyer that Local 78 intended to file a grievance against York. Severino also told Kallmeyer that Local 78 would probably put up a large thirty-foot inflatable rat[4] outside of Lincoln Center and distribute leaflets and handbills to inform the public and the Lincoln Center personnel of Betal's presence on the Library Project. Severino told Kallmeyer that if Betal did not stop working at the Library Project, Local 78 would "put up a line around the building." Severino and Kallmeyer both testified that Severino meant and Kallmeyer understood that the line would be an informational line and not a picket line.[5] Kallmeyer testified that he informed Betal's employees, Rovcanin and Quigley, that Local 78 was threatening to put up a line and disrupt the job if Betal did not stop work at the Library Project.

Severino also had conversations with employees of Betal. According to Miliboj Dobric, a member of Local 339 and Betal's working supervisor for the Library Project, Severino told Dobric that Betal had to "stop the job" because its employees were not members of Local 78. Quigley testified that Severino informed him that if Betal continued performing the asbestos work, Local 78 would picket and that in response Local 79, a MTDC union whose members were employed by the demolition subcontractor at the Library Project, would stop working. Rovcanin testified that Severino spoke to him on the telephone and informed him that Betal had to stop work at the Library Project because Local 78 claimed the work. Contrary to the claims of Betal's employees, Severino testified that he never told anyone from Betal that Local 78 would picket the job site or put a line around the building.

Salvatore Speziale, the president of Local 78, spoke to Prude by phone and informed him that York was in violation of the BCA–MTDC collective bargaining agreement for hiring a subcontractor that was not a signatory to the agreement. Speziale asked Prude to take care of the problem. Prude testified that Article II of the BCA–MTDC collective bargaining agreement required York to replace Betal with a Local 78 contractor. Prude stated that he decided to terminate Betal because it was not a signatory to the BCA–MTDC collective bargaining agreement. Prude also testified that at the time he decided to terminate Betal, no one from York or from Local 78 had informed him that Local 78 had mentioned picketing the job site. Kallmeyer testified that he had many conversations with Prude about the problem involving Local 78 and Betal and that Prude responded that York had to honor its agreement with Local 78. Kallmeyer also testified that he believes that at some point in his discussions with Prude he told Prude about Local 78's intention to put up a line.

---

**4.** Severino testified that the rat is used to draw attention to a labor dispute and to the union's handbills as well as to embarrass those who own the premises.

**5.** Severino described the difference between picketing and handbilling with the inflated rat as follows. Picketing involves a group of members walking back and forth outside of a building with picket signs. When a union is picketing, there is an unwritten rule that union members do not cross other unions' picket lines. Inflating a rat does not involve picketing and is not intended to stop others from working.

### F. Contact with the NLRB

In response to the labor dispute caused by Local 78, Betal filed unfair labor practice charges with the National Labor Relations Board ("NLRB") on September 21, 1999. The NLRB's Rita Lisko spoke to Kallmeyer about Betal's charges, and Kallmeyer informed her that Local 78 had threatened to put a line up around the building.

Local 78 sent a letter dated September 22, 1999 to Daniel Silverman, Regional Director of Region 2 of the NLRB. The letter stated:

> Local 78, Asbestos, Lead & Hazardous Waste Laborers, AFL–CIO ("Local 78") disclaim the work currently being performed by Betal Environmental Corp. at the New York Public Library Performing Arts Theatre, 40 Lincoln Center, 111 Amsterdam Avenue, New York, New York. Local 78 and its agents will not threaten to picket the jobsite or to engage in conduct in violation of Section 8(b)(4)(D) of the Act.

Ex. 14. This letter was forwarded to Betal by the NLRB on September 27, 1999. This letter was also forwarded to York's Zach on September 27, 1999.

■ The NLRB did not issue a complaint against Local 78 in response to Betal's charges. Furthermore, presumably because Local 78 disclaimed the work at the Library Project, the NLRB did not initiate a section 10(k) proceeding.[6]

### G. Betal's Termination

Prior to receiving Local 78's September 22, 1999 letter from the NLRB, York sent

---

**6.** Section 10(k) of the LMRA provides as follows:

> Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

29 U.S.C. § 160(k). Congress enacted section 10(k) in 1947 "[i]n the belief that resolution of jurisdictional disputes was more important to industrial peace than the imposition of unfair labor practice sanctions.... [Section 10(k) was enacted] to induce unions to settle their differences without awaiting unfair labor practice proceedings and enforcement of Board orders by courts of appeals." *International Tel. & Tel. Corp. v. Local 134, Int'l Bhd. of Elec. Workers*, 419 U.S. 428, 430–31, 95 S.Ct. 600, 42 L.Ed.2d 558 (1975).

This court notes that the fact that Local 78 disclaimed the work in question, obviating the need for a 10(k) proceeding in front of the NLRB, does not mean that the actions taken by Local 78 prior to disclaiming the work did not constitute a section 8(b)(4)(D) violation. *See International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp.*, 342 U.S. 237, 244, 72 S.Ct. 235, 96 L.Ed. 275 (1952) ("Certainly there is nothing in the language of § 303(a)(4) which makes its remedy dependent on any prior administrative determination that an unfair labor practice has been committed.... the jurisdictional disputes proscribed by § 303(a)(4) are rendered unlawful 'for the purposes of this section only,' thus setting apart for private redress, acts which might also be subjected to the administrative process. The fact that the Board must first attempt to resolve the dispute by means of a § 10(k) determination before it can move under § 10(b) and (c) for a cease and desist order is only a limitation on administrative power, as is the provision in § 10(k) that upon compliance 'with the decision of the Board or upon such voluntary adjustment of the dispute,' the charge shall be dismissed. These provisions, limiting and curtailing the administrative power, find no counterpart in the provision for private redress contained in § 303(a)(4).").

Betal a letter also dated September 22, 1999, stating:

> Please be advised as a result of events at the project site which we have become aware of we are constrained to advise you that if you fail to immediately remedy the labor dispute at the project site in compliance with Article XIII paragraph 13.01 of the Terms and Conditions to the Standard Subcontract this shall be cause for us to rescind the Letter of Intent and offer of Contract with Betal Environmental Corp.

Ex. 9.

Despite receipt of Local 78's letter disclaiming the work at the Library Project, York terminated Betal's subcontract by letter dated September 30, 1999. The letter stated:

> This shall serve that our Letter of Intent to enter into a subcontract with Betal Environmental Corp. is withdrawn due to your firm's failure to provide labor harmony pursuant to Article 13 of the Terms and Conditions to our Standard Subcontract or provide reasonable assurance that your firm would provide such labor harmony.

> You are hereby directed to vacate the project site and leave the premises in a manner which complies with applicable legal requirements within two (2) days of the date of this letter.

---

**7.** Prior to beginning work at the Library Project, Betal provided a Certificate of Liability Insurance to York that included an excess liability policy of nine million dollars. York required this excess liability policy.

**8.** Betal's on-site payroll costs for the week ending September 19, 1999 totaled $1814.79 and for the week ending September 26, 1999 totaled $1852.43. Betal's additional payroll costs for off-site labor included warehouse laborers, drivers, and payroll taxes. Betal was also required to pay 19.7% in gross payroll to workers' compensation.

Ex. 16. Plaintiff left the Library Project approximately two days after receiving the September 30, 1999 letter from York.

### H. Betal's Expenses and Expected Profit from the Library Project

From September 15, 1999 to September 22, 1999, Betal incurred actual costs of $16,000. This figure includes $1,000 for New York State Notification for the asbestos floor tiles, additional insurance expenditures of $3,500,[7] payroll of $6,900,[8] material of $3,700, and disposal costs of approximately $900.

Rovcanin testified that he expected Betal to receive $55,035.75 in expected profits and overhead expenses. Rovcanin estimated this figure by calculating 33% of the total contract price. Betal never received any payment from York and never realized its expected profits and overhead expenses.

## II. CONCLUSIONS OF LAW

### A. Local 78

Betal brings this action for damages against Local 78 under section 303 of the LMRA. Section 303 provides for district court jurisdiction over any claim of injury arising out of a labor organization's alleged violation of section 8(b)(4) of the LMRA, declaring certain types of strikes, threats and boycotts to be unfair labor practices.[9]

---

**9.** Section 303 provides in part:

> (a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

> (b) Whoever shall be injured in his business or property by reason or [sic] any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in

Specifically, Betal alleges that Local 78 violated sections 8(b)(4)(B) and 8(b)(4)(D) of the LMRA.[10] Betal alleges that as a result of Local 78's actions, York terminated its agreement with Betal.

## 1. 8(b)(4)(B)

Betal complains that Local 78 violated section 8(b)(4)(B) by threatening and coercing Betal's employees to cease doing business with York.[11] Section

---

any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.
29 U.S.C. § 187.

10. Section 8(b)(4) provides in part as follows:
(b) Unfair labor practices by labor organization
It shall be an unfair labor practice for a labor organization or its agents—
(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

(D) forcing or requiring any employer to assign particular work to employees in a

---

8(b)(4)(B) prohibits certain secondary picketing and boycotting. This conduct is termed secondary because "pressure is brought to bear, not 'upon the employer who alone is a party (to a dispute), but upon some third party who has no concern in it' with the objective of forcing the third party to bring pressure on the employer to agree to the union's demands." *NLRB v. Local 825, Int'l Union of Operating Eng'rs*, 400 U.S. 297, 302–03, 91 S.Ct. 402,

---

particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:

Provided further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution . . . .

11. Betal seems to argue in its Findings of Fact and Conclusions of Law that Local 78 violated section 8(b)(4)(B) by making threatening or coercive comments to York's employees about a possible picket or boycott. To the extent that these activities were part of a jurisdictional dispute, this court will consider them under section 8(b)(4)(D). However, to the extent that these activities do not relate to a jurisdictional dispute, this court believes that the conduct is protected primary conduct which is not prohibited by section 8(b)(4)(B).

27 L.Ed.2d 398 (1971) (*quoting Brotherhood of Int'l Elec. Workers, Local 501 v. NLRB*, 181 F.2d 34, 37 (2d Cir.1950)). Primary activity, by which legitimate pressure is aimed at the employer with whom there is a primary dispute, "is protected even though it may seriously affect neutral third parties." *Local 825*, 400 U.S. at 303, 91 S.Ct. 402.

In this case, Local 78's primary dispute was with York over the breach by York of the BCA–MTDC collective bargaining agreement. Betal argues that Severino's conversations with Betal's employees, in which he told them that they must stop work at the Library Project and in which he allegedly threatened to picket the job site, were aimed at coercing Betal's employees to cease doing business with York in violation of section 8(b)(4)(B). Since Local 78's dispute was not with Betal, any efforts by Local 78 to induce Betal's employees to cease doing business with York could constitute proscribed secondary activity.

■ However, even assuming for the sake of argument that Severino's conversations with Betal's employees violated section 8(b)(4)(B), this court would not be able to award damages to Betal under section 303 of the LMRA. Section 303 only allows for the recovery of damages incurred "by reason of" a violation of section 8(b)(4). "That language 'requires that there be a causal nexus between the unlawful secondary activity and the injury suffered by the plaintiff.'" *Florida Sugar Mktg. & Terminal Assn. Inc. v. Local No. 3, Int'l Longshoremen's Ass'n*, 668 F.Supp. 173, 182 (S.D.N.Y.1987) (*quoting Feather v. UMW*, 711 F.2d 530, 537 (3d Cir.1983)). Injury occurs "'by reason of' particular unlawful conduct if such conduct 'materially contributed' to the injury, or was a 'substantial factor' in bringing it about, 'notwithstanding other factors contributed

also.'" *Mead v. Retail Clerks Int'l Ass'n*, 523 F.2d 1371, 1376 (9th Cir.1975) (citations omitted) (noting that the language of section 303 was drawn directly from the Clayton Act and stating that "[i]n the antitrust context, the 'by reason of' language is read as incorporating common law principles of causation.").

Even if Severino intended to coerce Betal's employees to stop work at the Library Project in order to resolve Local 78's primary dispute with York, the evidence fails to show that Severino's conduct toward Betal's employees contributed in any way to Betal's ultimate injury. Betal's employees did not refrain from working with York in response to Severino's comments, and York's decision to terminate Betal was not based on any action or inaction taken by the employees of Betal. This court therefore finds that because Severino's actions toward Betal's employees did not materially contribute to Betal's injury, Local 78 is not liable for damages to Betal for the alleged section 8(b)(4)(B) violation.

**2. 8(b)(4)(D)**

■ Jurisdictional disputes involve the competing and conflicting claims of labor organizations seeking the assignment of disputed work. "In 1947 Congress responded to the labor unrest caused by jurisdictional disputes by adding [section] 8(b)(4)(D), which made it an unfair labor practice for a labor organization to induce the employees of any employer to strike in the hopes of forcing an employer to assign particular work to employees in a particular labor organization." *International Tel. & Tel. Corp. v. Local 134, Int'l Bhd. of Elec. Workers*, 419 U.S. 428, 430–31, 95 S.Ct. 600, 42 L.Ed.2d 558 (1975).

Betal alleges that Local 78 violated section 8(b)(4)(D) when it claimed that the work Betal was performing belonged to

Local 78 under the BCA–MTDC collective bargaining agreement and sought to enforce this claim by threatening to put a line around the building and inflate a rat. Betal argues that Local 78 cannot try to enforce the union signatory subcontracting clause in the BCA–MTDC collective bargaining agreement by threatening coercive conduct with the intention of forcing York to cease dealing with Betal.

■ There are permissible means by which Local 78 could have enforced its contractual rights to the work performed by Betal. For example, a union may enforce a subcontracting agreement by taking a grievance to arbitration or by filing a lawsuit for damages under section 301(a) of the LMRA.[12] *See, e.g., Miron Constr. Co., Inc. v. International Union of Operating Eng'rs, Local 139*, 44 F.3d 558, 565 (7th Cir.1995) ("[T]he NLRB itself agrees that its decision to award work to one union does not preclude the losing union from pursuing its contractual remedies against the general contractor."). However, section 8(b)(4)(D) prohibits the use of a strike, picketing, or other economic pressure to enforce a subcontracting agreement. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982) ("[E]ven where construction unions have negotiated secondary clauses that are sheltered by the proviso, they may not enforce them by picketing or other forms of concerted activity."); *NLRB v. Local 445*, 473 F.2d 249, 253 (2d Cir.1973) ("While Congress in outlawing hot cargo agreements under Section 8(e) granted a special exception for agreements relating to the contracting or subcontracting of work to be done at the jobsite, the [NLRB] has held, and we agree, that Congress intended that enforcement of such provisions may be effected only through the courts."); *Laborers Dist. Council (Capitol Drilling Supplies)*, 1995 WL 538966, 318 NLRB 809 (1995) ("[I]n the construction industry, a union's action through a grievance procedure, arbitration, or judicial process, to enforce an arguably meritorious claim against a general contractor that work has been subcontracted in breach of a lawful union signatory clause, does not constitute a claim to the subcontractor for the work, provided that the union does not seek to enforce its position by engaging in or encouraging strikes, picketing, or boycotts or by threatening such actions.").

■ Betal argues that Severino's comments to York's employees indicating that Local 78 intended to put a line around the building and inflate a rat constitute a proscribed threat to picket. In defending its actions, Local 78 admits that threatening to picket the Library Project to enforce its collective bargaining agreement would violate section 8(b)(4)(D). However, Local 78 asserts that there was no violation of section 8(b)(4)(D) because putting up a line for handing out handbills and inflating a rat to call attention to the handbills is merely informational picketing which is protected under the First Amendment. *See Thornhill v. Alabama*, 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) ("In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as

12. Section 301(a) provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).

within that area of free discussion that is guaranteed by the Constitution.").

In seeking to prove that Local 78 was engaging in informational picketing, Severino testified that he has encountered other situations in which general contractors that were signatories to the BCA–MTDC collective bargaining agreement subcontracted work to subcontractors that were not signed with the MTDC. In these situations, Severino testified that Local 78 had never organized a picket line. Severino testified that Local 78 had previously inflated a rat at Lincoln Center when a non-union contractor was performing work at the Julliard School. On this occasion, no workers ceased work or refused to enter the job site.

 This court believes, based on the evidence presented at trial, that the actions threatened by Local 78 fall into the category of informational picketing. However, the issue to be resolved in determining whether a section 8(b)(4)(D) violation occurred is whether or not the threat of such informational picketing, even though it is protected speech in other circumstances, constitutes prohibited coercive activity within the context of an alleged section 8(b)(4)(D) violation.[13]

 However, as was true with Betal's claim of a section 8(b)(4)(B) violation, even assuming that Local 78's threat of informational picketing violated section 8(b)(4)(D),

this court would not be able to award damages to Betal under section 303 of the LMRA. Based upon the testimony given at trial, this court does not find that Betal's injury came about "by reason of" the conduct of Local 78's agents. Although it is true that Severino threatened informational picketing in his conversations with Kallmeyer, Kallmeyer did not have ultimate decision-making authority to terminate Betal's services. Prude was the only person at York who could terminate Betal, and Prude testified that when he made the decision to terminate Betal, he had not been made aware of Local 78's intentions. Rather, Prude testified that Speziale contacted him and informed him that York was in violation of the BCA–MTDC collective bargaining agreement. Prude was asked to take care of this problem. Prude's testimony concerning his desire to abide by the BCA–MTDC collective bargaining agreement is supported by the fact that Prude is the president of the BCA. In this court's opinion, Prude's position as the head of the BCA provides an additional explanation of Prude's motivation to uphold the terms of the BCA–MTDC agreement.

Furthermore, even if Prude had been informed of Local 78's threats to picket and inflate a rat, this court does not believe these threats caused the decision to terminate Betal. On September 22, 1999, York asked Betal, by letter, to remedy the

---

**13.** The court notes that an answer to this question depends upon the intent of the union in threatening or engaging in the informational picketing. *See Vincent v. Steamfitters Local Union 395,* 288 F.2d 276, 278 (2d Cir.1961) (finding that the union's picketing by banner and leaflet was not an informational exercise but an effort to drive two non-union workers off the job and was therefore an unfair labor practice not protected by the First Amendment). *See also International Longshoremen's & Warehousemen's Union, Local 32 v. Pacific Maritime Ass'n,* 773 F.2d 1012, 1018–19 (9th Cir.1985) ("We have interpreted the scope of section 8(b)(4)(ii) pragmatically, looking to the 'coercive nature of the conduct, whether it be picketing or otherwise,' and finding an unfair labor practice when there is 'proof which if viewed realistically tends to show' a coercive effect." (citations omitted)); *Amalgamated Packinghouse, Leather & Allied Food Workers of Wisconsin,* , 1975 WL 5627, 218 NLRB 853, 854 (1975) (finding no basis to infer bad intent where union threatened conduct which it intended as informational picketing).

labor dispute at the job site in compliance with the terms of the subcontract. Betal did effectively resolve the labor dispute by complaining to the NLRB, thus prompting Local 78 to disclaim the work and state that it would not engage in picketing or other conduct which would violate section 8(b)(4)(D). York was made aware of Local 78's disclaimer on September 27, 1999. Therefore, by the time York terminated Betal, on September 30, 1999, the threat of unfair labor practices at the Library Project job site had been diffused. This court finds, therefore, that York's decision to terminate Betal rested on York's discovery that it had inadvertently violated the BCA–MTDC collective bargaining agreement and its desire to rectify that breach.[14] Because this court does not believe that Betal's injuries were caused by a violation of section 8(b)(4)(D) by Local 78, Betal has failed to prove the causation required to receive damages under section 303 of the LMRA.

## B. York

■ Betal claims that York breached the subcontracting agreement by not compensating Betal for its services at the Library Project. Because of this breach, Betal seeks an award of compensatory damages in the amount of $16,000, lost profits and overhead expenses in the amount of $94,086, and prejudgment interest dating back to September 22, 1999.

York advances two arguments in opposition to Betal's claim.[15] First, York argues that Betal failed to comply with the labor harmony provision of the subcontracting agreement contained in Article XIII, and that as a result, a labor dispute arose.

York argues that because this constituted a failure to comply with a material term of the subcontract, York was entitled under Article XIX of the subcontracting agreement to terminate Betal without "any compensation or payment of any kind whatsoever . . . ." *See* Ex. B, ¶ 19.01.

York's second argument is that even if this court finds that York cannot rely upon Article XIX of the subcontracting agreement to terminate Betal, York can terminate Betal "for any reason or for no reason" under Article XX of the subcontracting agreement. *See* Ex. B, ¶ 20.01. This termination for convenience clause provides for recovery of certain costs incurred by the subcontractor as well as overhead, but does not provide for payment of lost profits. Thus, York argues that under the terms of the subcontracting agreement, York is not responsible to Betal for Betal's claimed lost profits and overhead expenses in the amount of $94,086.

■ Under New York law, a plaintiff in a breach of contract action must prove: (1) a contract; (2) performance by plaintiff; (3) breach of the contract by defendant; and (4) damages. *See First Investors Corp. v. Liberty Mutual Ins. Co.*, 152 F.3d 162, 168 (2d Cir.1998).

This court finds that a valid contract existed between York and Betal, as evidenced by the letter of intent and by the Contract Closing Sheet. This court also finds that Betal provided services under the contract until it was discharged on September 30, 1999, and that because Betal has not been compensated for its services, it has suffered damages.

---

**14.** Whether or not York could terminate Betal without paying Betal for its services or providing other compensation is an issue that will be taken up in Section II.B. of this Opinion.

**15.** York's arguments are advanced in its Pre-Trial Memorandum of Law.

As for the issue of whether York breached the subcontracting agreement when it terminated Betal and refused to pay for Betal's services, this court looks to the terms of the subcontracting agreement itself. York argues that Article XIX allows it to terminate Betal without any compensation or payment because Betal materially breached the contract by failing to comply with the contract's labor harmony clause. Under New York law, "[f]or a breach to be considered material, 'it must go to the root of the agreement between the parties.'" *Franklin Pavkov Constr. Co. v. Ultra Roof, Inc.*, 51 F.Supp.2d 204, 215 (N.D.N.Y.1999) (*quoting Frank Felix Assocs. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir.1997)). This court finds that the labor harmony clause of the subcontracting agreement did not go to the root of the agreement between the parties.

The labor harmony provision in Article XIII provides, in part: "Subcontractor shall submit any jurisdictional disputes to the New York Plan or to any other comparable building trades council having similar jurisdiction over labor disputes." *See* Ex. A. This clause, on its face, does not make it clear that to bring a dispute to the New York Plan the subcontractor must be a signatory to the BCA–MTDC collective bargaining agreement. Furthermore, York did not make any attempt to clarify to Betal that the labor harmony clause in the subcontracting agreement required Betal to be a signatory to the BCA–MTDC collective bargaining agreement. In fact, Prude admitted that Zach made a mistake when he did not specify to Betal what he meant when he asked if Betal was "union." Given the ambiguity in the subcontracting agreement as to what was required to satisfy the labor harmony provision and York's failure to call attention to this provision and explain its requirements, it cannot be said

that this provision went to the root of the agreement between the parties. Indeed, it appears that there was no clear understanding between the parties as to what was required by this provision. *See Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399, 393 N.Y.S.2d 350, 361 N.E.2d 999 (N.Y. 1977) (in determining what the terms of a contractual agreement are "it is necessary to look . . . to the objective manifestations of the intent of the parties as gathered by their express words and deeds."). Because New York law provides that ambiguity in contractual terms will be resolved against the draftsman, York cannot rely upon Betal's inability to comply with the ambiguous labor harmony clause to terminate the contract without paying for Betal's services. *See 67 Wall Street Co. v. Franklin Nat. Bank*, 37 N.Y.2d 245, 371 N.Y.S.2d 915, 333 N.E.2d 184 (N.Y.1975) (stating the rule that doubt or ambiguity in a contract's terms will be resolved against the draftsman).

Because York was not entitled to terminate Betal for cause for its inability to comply with the labor harmony provision, York's termination of Betal must fall under the termination for convenience provision of the subcontracting agreement contained in Article XX. Paragraph 20.01 of that article provides:

> Contractor may terminate this Subcontract at any time for any reason or for no reason. In such event, Contractor shall pay to Subcontractor on account of Work performed prior to the effective date of such termination: (i) all actual costs approved by Contractor as having been paid or incurred by Subcontractor in connection with performance of Work; (ii) all costs incurred with Contractor's prior written approval in settling or discharging outstanding commitments entered into, in good faith, by Subcontractor in connection with performance of

Work; and (iii) a reasonable amount to cover general overhead expenses of Subcontractor incurred in connection with the performance of Work and which are not covered by payments under items (i) and (ii) above.

Ex. B. Because York failed to make payments to Betal under this provision, York breached the subcontracting agreement. *See Franklin Pavkov*, 51 F.Supp.2d at 215 ("Failure to tender payment pursuant to the terms of a contract is generally considered a material breach.") (*citing ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643, 649 (2d Cir. 1991)). York is therefore required to compensate Betal pursuant to the terms of ¶ 20.01 of the subcontracting agreement.

In addition to these compensatory damages, Betal argues that York is required to compensate Betal for lost profits and overhead expenses. However, to recover future lost profits as damages for breach of contract, "there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made." *Kenford Co., Inc. v. County of Erie*, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 (N.Y.1986). As York correctly points out, Article XX of the subcontracting agreement, which is unambiguous and to which both parties assented, distinctly excluded the recovery of lost profits and limited recovery for overhead expenses to overhead for work actually performed by the subcontractor. York is, therefore, not liable to Betal for future lost profits and overhead expenses.

Given the above, this court finds in favor of Betal in its claim against York for breach of contract and orders York to pay Betal compensatory damages in the amount of $16,000. York is also directed to pay Betal prejudgment interest at a statutory rate of 9% per annum. *See* N.Y.

C.P.L.R. 5001, 5004; *see also Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 93 (2d Cir.1984) ("Under the law of New York ... prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract."). Because York terminated Betal's contract on September 30, 1999 and failed to make the required payments to Betal at that time, the date from which prejudgment interest shall be calculated is September 30, 1999.

## III. CONCLUSION

Plaintiff Betal's claims against defendant Local 78 for damages are DENIED because Betal cannot establish the required causation under section 303 of the LMRA. Even if this court assumes that Local 78 violated sections 8(b)(4)(B) and 8(b)(4)(D) of the LMRA, Betal has failed to show that these violations caused Betal's injuries.

Betal's breach of contract claim against defendant York is GRANTED. Betal established that York breached its subcontracting agreement with Betal by failing to compensate Betal under Article XX of the subcontracting agreement. York is therefore directed to pay Betal $16,000 in compensatory damages and statutory prejudgment interest calculated from September 30, 1999 at 9% per annum.

The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.